[Civ. No. 1801.    Third Appellate District.—April 9, 1918.]

GRAVELLY FORD CANAL COMPANY (a Corporation), Appellant, v. POPE & TALBOT LAND COMPANY (a Corporation), Respondent.

EXECUTED PAROL LICENSE—CONSTRUCTION OF CANAL—FAILURE TO OB-JECT—EXPENDITURES IN CONSTRUCTION.—Where a land company was advised by a canal corporation that a right of way was desired over its land for canal purposes, without which privilege the project could not be effected, and made no objection to the surveying of the route for the canal, or of entering upon the work of construction, and with knowledge that the work had begun, commenced negotiations to fix the compensation for the privilege, and such negotiations were thereafter continued for nearly four years without result, the canal corporation in the meantime spending eighty thousand dollars, and the land owner at no time objecting to the prosecution of the work until such amount was expended, the conduct of the land owner amounts to an executed parol license, and it is estopped from enjoining the canal corporation from proceeding with the work, and is limited to an action at law for damages.

ID.—IRREVOCABLE LICENSE.—A license by deed or parol is revocable at pleasure, except under certain circumstances, such as, where it is executed, or where by reason of expenditures made by the licensee on the strength of the license, it would be inequitable to permit a revocation.

LACHES—LYING BY AND ACQUIESCENCE.—While mere lapse of time may not constitute laches, lying by and acquiescence are important fac-tors in determining whether there has been such laches as to con-stitute a bar to relief in equity.

APPEAL from a judgment of the Superior Court of Madera County.    Wm. M. Conley, Judge.

The facts are stated in the opinion of the court.

Edward F. Treadwell, for Appellant.

J. W. Dorsey, and W. E. Cashman, for Respondent.

CHIPMAN, P. J.—This is an appeal from the final judg-ment of the superior court of Madera County, in favor of defendant and against plaintiff, and granting a permanent injunction.    The parties to the action are the same as in No.

1802, recently decided by this court (*ante,* p. 556, [178 Pac. 150]), wherein plaintiff sought to condemn a right of way over defendant's land under the act of 1911. (Stats. 1911, p. 1407.) In that case the lower court sustained plaintiff's right to condemn. Upon review we were constrained to reverse the judgment. The purpose for which plaintiff was organized and the necessity for a right of way over defendant's land were fully set forth in that action and need not be here repeated. It is probable that the learned trial judge, who held plaintiff entitled to condemn a right of way under the act of 1911, granted the injunction prayed for by defendant in the present action on its cross-complaint, for the reason that plaintiff should be restricted to its right to condemn. On the other hand, plaintiff believing it had the right to proceed with the work of constructing its canal, did not rely alone upon its action to condemn but went forward with its work on the assumption that defendant had consented thereto. Being interrupted in the work by defendant, plaintiff sought to enjoin defendant from interference therewith. Defendant answered and filed a cross-complaint seeking to enjoin plaintiff from proceeding with said work. At the hearing the court granted the injunction prayed for by defendant.

In its complaint, plaintiff alleged, among other facts, the following: That plaintiff is a mutual water company, organized for the purpose of supplying water to its stockholders; that it posted and recorded notice of appropriation of the waters of the San Joaquin River in May, 1912, and surveyed the line of its canal from the San Joaquin River to Fresno River; that a right of way two hundred feet wide is necessary; that plaintiff immediately began the construction of the canal and expended over forty-eight thousand dollars in the construction thereof; that as surveyed, it runs through three sections of defendant's land and describes its location through those sections. Paragraph VIII of the complaint is as follows: "That during all of the times herein mentioned the said defendant well knew of the plans and surveys of the said plaintiff and during the year 1912 the said plaintiff in the construction of the said canal entered into and upon the said lands of the said defendant and laid out and surveyed the said canal through the said lands, and in that year commenced the construction of said canal through the said lands, and from time to time has since continued work upon the

said canal through the lands' of the defendant aforesaid, and has partially constructed the said canal through the said lands for a distance of approximately three (3) miles in length, and has expended on the portion of said canal passing through the defendant's land upwards of three thousand dollars, and the said plaintiff so entered into and upon the said lands and did the work with the knowledge, consent and acquiescence of the said defendant, and the said defendant at all times knew that the said plaintiff was constructing the said canal on the said lands of defendant, and was spending the money aforesaid, and the said plaintiff is still in possession of said strip of land through the said lands of defendant aforesaid, and is now actually engaged in completing the construction of the said canal through the same."

It is also alleged that defendant's said land is situated midway between the termini of the canal and that the canal is designed to irrigate seventeen thousand acres of land. Paragraph XII is as follows: "That ever since the said plaintiff surveyed the said canal through the said land of defendant, and ever since the said plaintiff commenced the construction of the said canal through the said land of defendant, the said plaintiff and the said defendant Pope & Talbot Land Company have been engaged in negotiations looking to the fixing of the damages which would be caused to the said defendant and its said lands by the occupation of the said right of way in the construction and operation of said canal, and looking to the fixing of the amount to be paid the said defendant therefor, and at all times the said defendant permitted the said plaintiff to continue to construct the said canal through the said land relying upon the representations of the said defendant that the said matters would be amicably adjusted and agreed to, and at all times the said plaintiff in constructing the said canal through the said lands relied upon the consent of the said defendant that it might enter upon said land and construct the said canal, and relied upon the representations of the said defendant that said matters of damages and compensation would be amicably settled and adjusted between them, and also, on the faith of the license so granted by the said defendant to said plaintiff to enter upon the said lands and construct said canal, the said plaintiff also constructed other portions of the said canal both north and south of the lands of the said defendant, and which

without the said canal and right of way through the said land of defendants would be useless and of no value, and during all of said time the said defendant had full knowledge of all of the things aforesaid and never at any time until the month of December, 1916, in any way objected to the occupation of the said right of way or to the construction of the said canal through the said land.''

Paragraph XIV is as follows: ''That the said plaintiff has at all times been and still is ready, able and willing to pay the said defendant just compensation for the right of way sought to be acquired through its lands for the canal aforesaid, and all damages which will be caused to the said defendant and its said land by the construction, maintenance and operation of the said canal under and upon the same, and said plaintiff hereby offers and agrees to pay the same, but the said defendant now refuses to fix or agree upon the amount of the said compensation or damages or either thereof, and notwithstanding the willingness of the said plaintiff to pay such compensation and damages the said defendant now does and ever since the month of December, 1916, has refused to recognize the right of the said plaintiff to continue in the occupation of the said right of way or to continue in the construction and completion of the said canal aforesaid through the lands of said defendant.''

It is further alleged that owing to the topography of the country, the canal is located at the only practicable place; that defendant is the owner of the land subject to plaintiff's right to occupy the canal across the same; that plaintiff is in actual possession of the land and defendant is estopped from interfering therewith. The prayer is that defendant be enjoined from interfering with the continued occupation of the canal and for damages.

A demurrer to the complaint was overruled and defendant answered in effect denying substantially all the allegations of the complaint. The answer also sets up certain affirmative defenses; that the entire natural flow of the San Joaquin River has been and must be continued to be used by prior appropriators and the use of water through said canal would result in depriving other and richer land of water; that Miller & Lux (Incorporated) is the sole owner of the capital stock of plaintiff, to whom alone defendant has power to distribute water; that there is no appropriable water at the

intake of said canal; that plaintiff does not intend and has no power to put said canal to a public use.

Defendant alleges in its cross-complaint certain facts, stated as follows in defendant's brief: "That the defendant is the owner of twenty sections of land in Madera County; that from time to time during November and December of 1916 and 1917, a large force of men with teams and machinery forcibly broke into parts of said land and took up and removed soil therefrom in the construction of the canal; that said entry and work was without any authority or right whatever from the defendant and contrary to its wishes and against and in contempt of its repeated protests; that the location of the line of said canal and construction thereof so far as it has progressed, practically bisects the said twenty sections belonging to the defendant and prevents the natural surface water flowing from the higher to the lower portions thereof, and the levee constructed along the east bank will back up surface waters and thereby cover large areas of the defendant's ground, drown and destroy the natural grass and herbage and the crops of grain annually produced thereon, and will saturate and water-log the soil and bring to the surface the alkali in the low places and depressions thereof and prevent the growth of any vegetation; that said canal will be impassable for man, beast or machinery; will require the construction and maintenance of numerous and expensive bridges and will essentially interfere with the use and enjoyment of the defendant's land and prevent its beneficial use; that plaintiff claims an adverse interest in the defendant's land which is without any right, and that plaintiff has not any estate, right, title or interest whatever in the defendant's lands; that defendant prays, among other things, for a permanent injunction."

To this cross-complaint plaintiff answered, alleging that it entered into the lands with the knowledge and consent and acquiescence of the defendant; incorporated the allegations of its complaint; pleaded the defense of laches and delay, and alleged that it is ready, able, and willing to pay the value of the right of way, and prayed for the relief sought in the complaint.

We think the complaint may be considered as relying upon estoppel, on which, as appellant claims, it is primarily based and that the estoppel arises out of a parol license. It has

36 Cal. App.—46

been held by some courts that where a person permits another to go upon his land, makes valuable improvements, expends money in the construction of ditches or canals, no estoppel arises, because the licensee is charged with the knowledge of the licensor's ownership of the land and of the rule of law that the licensor may at any time object to a further occupation of the land by the licensee. Such, however, is not the law in this state.

As the true rule in such cases is matter of contention in the present case, we feel justified in quoting at some length from the decision in *Stoner* v. *Zucker*, 148 Cal. 516, 518, [113 Am. St. Rep. 301, 7 Ann. Cas. 704, 83 Pac. 808], which was the case of a parol license to construct a water ditch. Mr. Justice Henshaw, with his usual clearness, stated the views of the court: "Appellant contends that a parol license to do an act upon the land of the licensor, while it justifies anything done by the licensee before revocation, is revocable at the option of the licensor, so that no further acts may be justified under it, and this, although the intention was to confer a continuing right, and money has been expended by the licensor upon the faith of the license; and that such a license cannot be changed into an equitable right on the ground of equitable estoppel. To the support of. this proposition is offered authority of great weight and of the highest respectability. The argument in brief is that a license in its very nature is a revocable permission; that whoever accepts that permission does it with knowledge that the permission may be revoked at any time; that the rule cannot be changed, therefore, because the licensee has foolishly or improvidently expended money in the hope of a continuance of a license, upon the permanent continuance of which he has no right in law or in equity to rely; that to convert such a parol license into a grant or easement under the doctrine of estoppel is destructive of the statute of frauds, which was meant to lay down an inflexible rule; and finally, that there is no room or play for the operation of the doctrine of estoppel, since the licensor has in no way deceived the licensee by revocation, has put no fraud upon him, and has merely asserted a right which has been absolutely reserved to him by the very terms of his permission. No one has stated this argument more clearly and cogently than Judge Cooley, who, holding to this construction of the law, has expressed it in his work

on Torts. (Cooley on Torts, 2d ed., 364.) But that the same eminent jurist recognized the injustice and the hardship which follow such a conclusion is plainly to be seen from his opinion in *Maxwell* v. *Bay City Bridge Co.*, 41 Mich. 453 [2 N. W. 639], where, discussing this subject, he says: 'But the injustice of a revocation after the licensee, in reliance upon the license, has made large and expensive improvements, is so serious that it seems a reproach to the law that it should fail to provide some adequate protection against it. Some of the courts have been disposed to enforce the license as a parol contract which has been performed on one side.' Indeed, the learned jurist with equal accuracy might have stated that the majority of courts have so decided, in accordance with the leading case of *Rerick* v. *Kern*, 14 Serg. & R. (Pa.) 267, [16 Am. Dec. 497]. That case was carefully considered, and it was held that it would be to countenance a fraud upon the part of the licensor if he were allowed, after expenditure of money by the licensee upon the faith of the license, to cut short by revocation the natural term of its continuance and existence, and that under the doctrine of estoppel, the licensor would not be allowed to do this. The decision was that the licensor would be held to have conveyed an easement commensurate in its extent and duration with the right to be enjoyed."

In the case of *Miller & Lux* v. *Kern County Land Co.*, 154 Cal. 785, [99 Pac. 179], the court said: "The principal contention upon appeal is that this court should recede from the view which it adopted and expressed in *Stoner* v. *Zucker*, 148 Cal. 516, [113 Am. St. Rep. 301, 7 Ann. Cas. 704, 83 Pac. 808], and should adopt the contrary view, that a parol license, regardless of its nature, is always revocable at the will of the licensor. This question was duly considered in *Stoner* v. *Zucker*, 148 Cal. 516, [113 Am. St. Rep. 301, 7 Ann. Cas. 704, 83 Pac. 808], the conflict of authority was recognized, and the conclusion there expressed deliberately adopted. We perceive no reason for receding from that conclusion." The Stoner case was distinguished in *Davis* v. *Martin*, 157 Cal. 657, 661, [108 Pac. 866], and in *Broads* v. *Mead*, 159 Cal. 765, 767, [Ann. Cas. 1912C, 1125, 116 Pac. 46], upon the facts, but the rule laid down in the Stoner case was in no degree impaired.

We are, therefore, chiefly concerned with the question whether or not the facts in the present case bring it within the rule enunciated in *Stoner* v. *Zucker, supra.* Most of the evidence is found in a somewhat extended correspondence conducted by J. Leroy Nickel, president of Miller & Lux, Incorporated, who also testified as a witness for plaintiff, and by W. H. Talbot, president of Pope & Talbot Company, defendant. Mr. Talbot did not testify.

Certain facts may be stated as shown by the evidence without contradiction. Miller & Lux, Incorporated, owned a large body of land situated between the San Joaquin River and Fresno River, and east of what is known as the Aliso canal, and extending from the intake of the canal in question at the San Joaquin River northerly about fifteen miles to the Fresno River; defendant also owned a large body of land, three sections of which, to wit, sections 9, 21, and 22, township 12 south, range 16 east, are about midway between the termini of said canal; that in surveying the line of said canal it was found unavoidably necessary to pass over parts of these three sections of land in order to furnish water to the Miller & Lux lands lying north of defendant's land; the canal was designated to irrigate about seventeen thousand acres of the Miller & Lux land which had theretofore been unirrigated; plaintiff corporation was organized in May, 1912, and all of its stock was owned by Miller & Lux; in that month plaintiff made its appropriation of the water of the San Joaquin River; the object being to carry out the canal enterprise and convey said water for the irrigation of the lands of Miller & Lux and not as a public service corporation; construction work was done on the canal by Miller & Lux in the spring of 1912, before plaintiff was incorporated, but thereafter the work was prosecuted by plaintiff under an agreement with Miller & Lux. More or less work was done in 1912 for the entire length of the canal, including construction work through defendant's said sections of land; Miller & Lux was in possession of two of defendant's said three sections of land and other of its land as lessee; there was construction work done on the canal in 1912 from its intake for its entire length to Fresno River, through defendant's land as well as through land of Miller & Lux. Mr. Nickel testified: ''In that year I took up with the representatives of Pope & Talbot Company the matter of their

granting a right of way for a canal through those sections of land (9, 21, 22), and from that time until shortly before the commencement of this action (complaint was filed January 9, 1917), these negotiations continued with that company. I, myself, carried on personally the greater part of those negotiations. The greater part of those negotiations were by written correspondence passing between myself and the representatives of Pope & Talbot Land Company. . . . Whatever I did in this matter, I did on behalf of the two corporations I have mentioned." (Miller & Lux, Incorporated, and plaintiff.) The witness then produced and there was admitted a number of letters constituting the written correspondence between the parties concerned. It becomes necessary to show the material portions of this correspondence.

The letters are between Miller & Lux, Incorporated, and the defendant and embrace a period commencing March 29, 1912, and ending December 22, 1916. In the first letter, March 29, 1912, Miller & Lux informs defendant that it has made a survey for a canal from Gravelly Ford to the Fresno River running through certain lands of the defendant and stating: "We desire to purchase from you for this right of way a strip two hundred feet wide. This apparently wide strip is necessary for the reason of the large capacity of the canal and its shallow depth necessary on account of the hardpan through a great portion of the country south of your lands. We wish to commence construction at each end of the proposed canal in a few days and sincerely hope we may be able to obtain from you the desired right of way. Kindly let us hear from you stating the price you will charge us for the land required." March 30, 1912, defendant replied: "Before going further into this matter, we would thank you to send us a blue-print or at least a rough drawing showing just how this canal is to run through our property. Upon receipt of such a sketch, we shall be glad to take the matter up and advise you further." On April 1, 1912, Miller & Lux acknowledges receipt of the last above letter and states that a map of the survey is being prepared and the blueprint will be forwarded when completed. April 16, 1912, Miller & Lux writes defendant referring to the letter of March 29th, in which it had made application for a right of way for a canal through defendant's lands and describes

the course of the proposed line of the canal. April 18, 1912, defendant replies that while it can follow the right of way roughly from the description given, it would like to have a blue-print showing the exact course of the right of way "after which we shall then be glad to take the matter up further with you." April 22, 1912, Miller & Lux writes defendant stating that in compliance with its letter of April 18th, it inclosed two plats showing the course of the right of way through defendant's lands and stating that the engineer has now decided that the strip two hundred feet wide would be sufficient. May 4th defendant replies, stating, among other things, ". . . in this connection now have to suggest that you advise us just what you desire in the premises, stating definitely what concessions and reservations for use of water, etc., will be granted to the owners of adjacent property. If you will present these matters definitely and in detail, we shall be glad to take the matter up with the owners and advise you as to their conclusions." Miller & Lux replied on May 6, 1912, stating: "Our Mr. Nickel, who has this matter in charge, is in the San Joaquin Valley at present, and your letter will receive attention on his return to the office next week." On May 13, 1912, Miller & Lux replied to defendant's letter of May 4th: "In regard to the proposed right of way for a canal through your land and Madera County, our proposition is to purchase outright a strip of land of the width specified, paying you the full value for the same. In regard to any arrangement for the sale of water to you, or any concession for the use of water in exchange for the right of way, such act would give the canal the character of a public service corporation and would thus render entirely undesirable the building of the canal. We should be glad, however, if you so desire, to have you join with us in the expense of constructing this entire canal and assume equal responsibility on an acreage basis of the cost of the project. You would thus share in the use of water such percentage as your land would bear to ours. We have a large force of men, teams, etc., engaged upon this work and it is desirable that we have an understanding as early as practicable, as the construction will soon be up to your land." On May 17, 1912, Miller & Lux wrote to defendant, referring to its letter of May 13th, and stating: "If you prefer it, we should be willing to exchange land with you,

granting an acreage elsewhere equal to the proposed right of way, provided it be of similar quality and so forth. This has occurred to us as being possibly more acceptable to you than either of the other propositions, and if so, we shall be glad to take it up with you for detailed consideration any time." On May 24, 1912, Miller & Lux again wrote to defendant, in which letter it states that it has just received a letter from Mr. Clyne, who has charge of the construction of the canal, stating that the information which it requested of him for defendant's benefit "is not as explicit as we would like to submit. According to Mr. Clyne's idea, it is difficult, if not impossible, to estimate the cost of constructing this canal by reason of the unknown expense involved in removing the hardpan. Until the surface soil be removed, and the hardpan encountered as the canal construction proceeds, the quantity of hardpan to be removed is entirely indefinite. However, it is safe to say the entire cost of the canal and structures will not be less than $100,000.00, and not more than $125,000. Our proposition is if you should wish to join us in this enterprise that the entire cost of construction and future maintenance be born *pro rata* according to the quantity of land owned by this corporation and yourselves under the flow of the canal susceptible of irrigation. . . . There are some phases connected with this enterprise which you should, perhaps, understand more fully before making up your mind finally as to whether you wish to embark with us upon this project. We are almost sure to meet with expensive litigation, lasting in all probability through many years, and you will, of course, be expected to bear your proper proportion of the same. It will also be necessary that a very careful agreement be drawn by which any rights that would accrue to your land would be made subordinate to all of our prior rights, which will involve our entire irrigation system, aside from this Gravelly Ford Canal. If you would like to go into this matter more fully we should be glad to have Mr. Talbot call and see us at his very earliest convenience."

May 25, 1912, defendant answered the last above letter, stating: "Our Mr. W. H. Talbot will endeavor to arrange to see your Mr. Nickel some time Monday, which we trust will be satisfactory." June 18, 1912, Miller & Lux wrote to defendant stating that Mr. Ogle, division superintendent of Miller & Lux, had suggested a basis for an exchange of land

that he thought would be mutually beneficial to the parties concerned and stating that it would be glad to take the matter up on a basis of offering an exchange of lands of equal value. "We beg leave to suggest that if the exchange seems desirable to you that you appoint a representative to meet a representative appointed by us to agree upon the quality and value of the lands to be exchanged and in case these representatives fail to agree, that they be authorized to call upon a third person to conclude an agreement. This proposition is not submitted in lieu of our previous proposition to have you join with us in the construction of the proposed canal, and should you, upon reflection, prefer to join us in the building of the canal with a view to irrigate the lands you own under the canal, we shall be pleased to carry out that arrangement." June 20, 1912, defendant acknowledges the receipt of the last above letter with reference to an exchange of land, stating: ". . . after we have had an opportunity of presenting this suggestion to our superintendent, we will again communicate with you." July 22, 1912, defendant wrote to Miller & Lux referring to the suggestion that an exchange of lands might be effected, quoting from a letter written by defendant's superintendent in which he states that he has been over parts of the lands proposed for an exchange and that for satisfactory examination of the relative values it would facilitate his labors if he were furnished a plat "showing the acreage lying on the east side of the canal of the various sections of their land through which the canal passes." July 25, 1912, Miller & Lux replied, stating that it had prepared a plat showing its lands east of the canal as requested and on August 31, 1912, Miller & Lux submitted a proposition definitely describing its lands which it proposed to exchange for definitely described lands belonging to defendant, and suggested that each party appoint an appraiser to appraise the lands, and if they could not agree, to appoint a third, and that the decision of a majority of the appraisers be binding, and in case the lands of defendant should be more valuable than those of Miller & Lux, that it pay the difference in cash. "If this general idea is satisfactory to you, kindly let us know and we will draw a formal agreement." September 3, 1912, defendant acknowledged the receipt of the last above letter, stating that it desired a blue-print diagram showing the location of the proposed

canal which it had not yet received and that it wanted this map to forward to its superintendent to aid him in picking out the land to be received in exchange for its land, and stating: ". . . while we have not had a chance to look over the sections mentioned in your letter, at the same time we would be glad to have this map to refer to and would thank you to send it to us at your earliest convenience." September 5, 1912, defendant wrote Miller & Lux, acknowledging receipt of the plat of the lands proposed for exchange and stating that it would send the map to its superintendent. October 8, 1912, defendant wrote Miller & Lux: "Further referring to proposed exchange of lands in Madera County in order to permit of the construction of your canal, would state that we have been in communication with our superintendent, and after going thoroughly over this matter, it has been suggested that we exchange on the basis of descriptions as follows: [Then follows a description of the sections proposed for exchange.] An exchange as above outlined would block out our holdings and would at the same time enable you to proceed with the construction of the canal as now surveyed. By this exchange, we would be transferring to you ten full sections and that portion of section 22 lying west of the east bank of the canal, while you would be transferring to us fifteen full sections. We consider this a fair and equitable basis of exchange, for the reason that the land which we propose to transfer to you lies west of the canal and would, therefore, lie under the flow of the Gravelly Ford Canal and in consequence thereof would be greatly enhanced in value. . . . If an arrangement along these lines meets with your approval, we shall be glad to take the matter up further with you and conclude the final arrangements." On the same date, October 8, 1912, Miller & Lux acknowledged receipt of the above letter, stating: "The proposed exchange of land does not appeal to us at all. This proposition for an exchange of land emanated from you and not from us. We supposed and understood that your object in wishing to exchange land was to consolidate your holdings, and we never for a moment contemplated an exchange on any other basis than an equivalent in acreage, with such adjustment for any difference in the value of the land as the appraisers might find to exist." October 22, 1912, Miller & Lux wrote to defendant: "Since apparently there seems to be no practicable

basis for an exchange of land as contemplated, we should be pleased to take up with you the matter of a right of way through your lands for our Gravelly Ford Canal. At your convenience we should like to hear from you on this subject." October 25, 1912, defendant acknowledged the receipt of the last above letter, saying: "We have no suggestions to offer other than those already submitted. At the inception of the negotiations, we requested you to indicate what concessions in the way of water rights, etc., you would be willing to grant in return for right of way through our property, and upon your refusal to consider any such arrangement, we have endeavored to come to an understanding on the basis of an exchange of certain lands, which has likewise been rejected on your part. We have endeavored to suggest a means of coming together, but as our proposals have not received favorable consideration, we shall now be glad to have you submit some plan that might be mutually acceptable. In conclusion we wish to add, however, that we shall expect something in exchange for this right of way which shall be commensurate with the value of the privilege which you are seeking." October 26, 1912, Miller & Lux replied to the above letter stating, among other things: "Permit us to say the last paragraph in your letter would seem to imply that we are expected to recognize in adjusting the value for the land conveyed for the right of way the same principle, which you suggested in regard to the exchange of land, viz., that the value of the land that you may convey to us is not to be determined upon the intrinsic value of the land, but upon its enhancement in value by reason of the application of water upon the land. We do not think that this is a tenable position on your part. On the contrary, we think the large expenditure of money involved in the construction of the canal, the risk and expense incurred in connection with the litigation that is likely to ensue, together with the expense of operating the irrigation system is a return which should legitimately accrue to the owners of the irrigation system. At least we have never heard of any different principle that was recognized in this state." Attention is then called to the act of 1911, considered in the condemnation case heretofore decided by this court and referred to above, and the writer states that under this law "an owner of land shall receive compensation for the value

of the land so condemned without regard to any possible
enhancement in the value of the lands upon which the water
may be applied.   We are quite willing to pay you for this
land all that any court or jury would award, and we cannot
imagine that on giving the matter proper consideration you
would think of demanding any more than this.   We hope
you will not embarrass us by declining to negotiate with us on
the basis of the value of the land, and thereby delay the oper-
ation of our irrigation system.   If you prefer to accept land,
in lieu of cash, for the acreage required for the right of way,
we are quite willing to convey to you lands of equal value
for the acreage you may convey to us.   We hope we shall
hear from you again on this subject at your earliest con-
venience.''

At this point the correspondence seems to have broken off;
at any rate, no letters appear again until October 27, 1915,
and is resumed by letter of Miller & Lux to defendant of that
date, stating: ''In accordance with our conversation of last
Monday, we submit herewith two propositions covering the
proposed exchange of lands in Madera County.''   The first
of these propositions related to the Aliso Canal project and
the second with regard to an exchange of lands as had been
previously contemplated.   October 28, 1915, defendant re-
plied expressing disappointment at the offer contained in the
letter of October 27, and stating that it had notified its super-
intendent, Mr. Straube, ''to proceed at once with the erection
of the necessary buildings for the new ranches which will be
placed under cultivation this coming season.''   November
3, 1915, Miller & Lux wrote the defendant as follows: ''Re-
ferring to the matter of the right of way for our Ford Canal
concerning which it is understood the matter is to be con-
sidered by you at an early date, I wish to suggest that, in
view of the fact that this canal runs through only three
sections of your land, it may be desirable that an exchange
be made for these three sections, and thus avoid the necessity
of surveying a right of way through your land, and thus
dividing the sections.''   November 6, 1915, defendant wrote
Miller & Lux with reference to the renewal of the lease of
the Madera County lands, stating: ''We now inclose herewith
original and duplicate which we would thank you to sign,
returning one copy for our files.''   November 9, 1915, Miller
& Lux wrote defendant acknowledging receipt of defend-

ant's letter of November 6th, and stating: ''We understood clearly your position, in regard to the matter of exchanging lands, when we wrote you on the 3d inst. We thought possibly, however, that you might prefer to have the land you farm intact, rather than have the Ford Canal pass through it, and we had this in mind when we suggested that possibly there may be three sections of our land which you would prefer, rather than retain the three sections you now own through which the canal passes. However, since this does not appeal to you, we have nothing further to suggest. Please allow us to add: In regard to the apparent irreconcilable differences, which precludes an exchange of land, while we are not able to appreciate the consistency of your position that the payment by us of what it will cost to build the levees is unsatisfactory to you, for the reason you feel that you are entitled to share, in some manner, in the benefits that would accrue to us by obtaining additional acreage under our canal, we should not be unwilling to meet your views at least to some extent, in addition to the payment of the cost of the levees, if the benefits you seem to think we would obtain were material and important. The fact is, however, that the benefits are almost entirely imaginary, for the reason we already own more land under the canal than we are able to irrigate, or probably ever shall be. If the capacity of the canal were sufficiently large, and the quantity of water available ample for irrigating all of the lands we now own under the Ford Canal, plus the land you also own under the canal, we could, no doubt, afford to pay you a considerable sum, as a bonus, in addition to an exchange of land of equal value, but since these conditions do not exist, there is no basis whatever for our meeting your views. We trust you will be able to take up the matter soon as to the basis on which you prefer to consider the right of way, either to sell us the necessary strip through the three sections referred to, or that we convey an acreage of equal quantity and value for your land embraced in the right of way.''

Correspondence broke off again and was not resumed until October 31, 1916, by letter of defendant to Miller & Lux in which it stated: ''We were very much surprised to be advised by our superintendent that you have again resumed work on the Ford Canal through lands of the Pope & Talbot Land Co. in sections 21 and 22, township 12 south, range 16

east, and we are quite sure that this action has been taken without your knowledge, for when this question was up for consideration on a previous occasion, we were assured that no further steps would be taken on your part before first again taking the matter up with us and an understanding having been reached between us." November 1st, Miller & Lux acknowledged the receipt of this letter and stated that it would have attention on the return of Mr. Nickel to its office. November 6, 1916, defendant wrote Miller & Lux calling attention to a recent visit by Miller & Lux to defendant during which the question of the right of a private corporation to condemn a right of way for irrigation, presumably under the act of 1911, and stating that "this information will greatly facilitate matters and probably save time in reaching a conclusion." Subsequent letters relate chiefly to this subject and to the opinions of attorneys for both parties. On November 29, 1916, defendant wrote, among other things: "We have no desire or wish to hinder you unnecessarily in your construction work, but we must ask for a reasonable time in which to investigate the matter before we can permit any further work on our lands." Finally, on December 20, 1916, defendant wrote to Miller & Lux, stating: "We have, as previously advised, instructed our superintendent to prevent any further construction work on our lands, and to resist any such effort to the fullest extent. We cannot permit the canal to be completed with the idea of having our rights determined at a later date, but shall on the other hand expect work to be suspended until a court ruling may be had under condemnation proceedings, which we are willing that you commence in order to determine your right to condemn a right of way over our property." The action, No. 1802, heretofore referred to, followed as also this action.

As shown by the letters introduced, there was a break in the written correspondence from October 26, 1912, to October 27, 1915, but it appeared from the testimony that work on the canal continued after 1912 without interruption or objection by defendant. Mr. Nickel testified: "We continued working on this canal and the portions of it that go through the Pope & Talbot land up to the time the temporary injunction was issued in this case. (The temporary injunction was granted May 8, 1917.) The canal was completed up to the Pope & Talbot land at that time. It was completed suffi-

ciently to carry water beyond that from there to the Fresno River. We had our men there on the ground working on this particular part on the Pope & Talbot land trying to complete it. Although construction work was done all the way through in 1912 on the entire canal, including the Pope & Talbot land, it was not completed. It was not down clear to the depth we expected to go." Other witnesses who knew of the work and assisted in it testified to like effect and there was no controverting testimony. Mr. Nickel testified: "At the beginning of the correspondence with Pope & Talbot we were the lessee of some sections of their land. (Including among them two of the three sections involved.) I am quite positive that we never went on the Pope & Talbot land until we had taken up negotiations with Mr. Talbot. I do remember very distinctly before we ever did a stroke of work on their land I had discussed that with Mr. Talbot. When I mentioned the fact of our project to them and discussed the subject by correspondence or orally, they did not oppose it. . . . I know that Mr. Talbot knew when the work was done and I explained it to him." He testified that his company had expended eighty thousand dollars on the work and it appeared that three thousand dollars of this had been expended on defendant's land.

Witness Bader, Miller & Lux's foreman of the division including this canal, took charge in February, 1914. He testified they irrigated in that year eight hundred acres of barley and some grass and a much larger acreage in 1915 and 1916 and put in some alfalfa; that two sections of land north of the defendant's land have been checked and prepared for irrigation besides two or three more roughly checked. He testified, as did other witnesses, that the flow of water comes occasionally in December and January, but that "the dependable flow comes in May, June, and July and at times in April." He testified further: "In 1915 we had a whole month of water filling that canal in January and we had six weeks of it later constantly. . . . We had water also in 1915 from May 4th up to July 20th, . . . and some going by. It wasted on a waste-gate. If it had not been for that waste-gate it would have gone through to Fresno River. In 1916 we had water until July beginning in the latter part of April. . . . In 1912 they worked on this canal about three

months; in 1913, 1914, and 1915, about the same. This year we worked more.''

Defendant introduced two witnesses. Clement H. Miller, a civil engineer, testified to certain facts in relation to the seasonal flow of water through the San Joaquin River and to the number of second-feet diverted by various canals and pumps which he stated he had ''gathered from state and government publications on the subject and statistics gathered by various commissions of the state of California and from personal observations and calculations as an engineer.'' He described the land lying west of the canal as what is known as hardpan land ''impregnated with alkali to a greater or less extent'' and not desirable as irrigable land, and ''especially as better land can be acquired in the immediate vicinity.'' He testified: ''This canal, as I view it, is intended, and is only useful to wash out alkali by flooding and turning the water impregnated with alkali into the Fresno River or Aliso Canal.'' He expressed the opinion that this canal ''is constructed and designed to carry extreme flood waters in large volumes for a few days only''; that ''this canal, if complete, will back water over lands belonging to the defendant lying east of the canal, and will also flood lands belonging to the defendant lying west of the canal, by seepage. The extent of this overflow and seepage cannot be determined at this time.'' He stated that ''there is not sufficient water in the San Joaquin River to supply all of the water needed by the canals taking water out of the river, to irrigate the lands lying under them, and there is not a dependable flow available for the Gravelly Ford Canal under present conditions. To divert water into this canal is to deprive other existing canals of water needed to irrigate much better land.''

Witness J. C. Straube, superintendent of defendant company for many years, testified that he was familiar with the Gravelly Ford Canal. He testified: ''It is surveyed across the lands of Pope & Talbot Land Company. It has never been completed across these lands. No water has ever flowed through it across these lands. Some work was done on sections 21, 22, and 9, township 12 south, range 16 east, in 1912, but the work has not been completed. The canal will back flood waters over lands lying east of it, and water will seep through the west bank on lands belonging to Pope & Talbot Land Company lying west of the canal.''

We have endeavored to state all the evidence bearing upon the issues, perhaps more fully than it need to have been.

Findings of fact and conclusions of law were waived. We are without aid as to the view taken by the trial court upon the issues of fact presented in the record. We must, upon material questions of fact as to which there is any substantial evidence in support of the judgment, assume that the court properly found in defendant's favor. If, however, there was no evidence, or if the evidence was insufficient in support of an implied finding essential to sustain the judgment; or where the uncontroverted evidence justified such a finding in favor of plaintiff instead of defendant's favor, the judgment cannot stand. Thus, as we view the case, the vital facts upon which plaintiff relies are found set forth in paragraphs VIII, XII, and XIV of the complaint, quoted above. The evidence, in our opinion, and without substantial conflict, fully supports the averments in said paragraphs. It seems to us that the correspondence by letter between the parties considered together with the uncontroverted testimony leads to no other reasonable conclusion than that this canal project and the purpose for which the canal was to be constructed were fully understood by defendant, and that the construction was entered upon and prosecuted with reasonable diligence for nearly four years with defendant's knowledge, consent, and acquiescence, and with the understanding that the only matter to be determined was the compensation to be paid or given defendant by Miller & Lux for the right of way, and that as to this the parties anticipated no difficulty in reaching an agreement and did not make the consummation of such agreement a condition precedent to plaintiff's right to enter into possession of defendant's land, complete the canal, and operate it for the purposes for which it was designed.

The questions, to our minds, are simply questions of law, namely: Do the facts and circumstances bring the case within the rule laid down in *Stoner* v. *Zucker,* 148 Cal. 516, [113 Am. St. Rep. 301, 7 Ann. Cas. 704, 83 Pac. 808], and did not the conduct of defendant amount to an executed parol license, and is not defendant estopped from interfering with the continued possession by plaintiff, and is not defendant limited to an action for compensation? A closely allied

question, also, is: Should defendant be given equitable relief in view of its laches in asserting its rights?

"A license is defined as a personal, revocable and unassignable privilege conferred either by writing or parol to do one or more acts on land without possessing any interest therein." (17 R. C. L. 584.) A license may be implied from the acts of the parties, from their relations, and from custom, and where the owner of land, with full knowledge of the facts, tacitly permits another to repeatedly do acts upon the land, the license may be implied from failure to object. (25 Cyc. 642.) The essential of a license that it be assented to may be shown by any acts which tend to show assent. (17 R. C. L. 572.) And the creation of a license privilege may be evidenced by acquiescence in its exercise. (Id.) A license by deed or parol, under the well-settled rule of the common law, is revocable at pleasure, unless under certain circumstances, among them, that it is executed and also unless, by reason of expenditures made by the licensee on the strength of the license it would otherwise be inequitable to permit the licensor to effect a revocation. In such case the license is irrevocable. (Id., 576, 578; *Stoner* v. *Zucker, supra; Miller & Lux* v. *Kern County Land Co.,* 154 Cal. 785, [99 Pac. 179].)

It is a familiar doctrine of laches, apart from any question of statutory limitation, that courts of equity will discourage laches and delay in the enforcement of rights, and the general rule is that nothing can call forth the court of chancery into activity but conscience, good faith, and reasonable diligence. Where these are wanting, the court is passive and does nothing. (10 R. C. L. 395.) While mere lapse of time may not constitute laches, lying by and acquiescence are important factors in determining whether there has been such laches as to constitute a bar to relief in equity. (Id., 397.)

With these principles before us, to what conclusion do the facts lead us in the present case? Before any work was done on the canal, defendant was notified of the project contemplated by plaintiff. (We refer to Miller & Lux and plaintiff interchangeably as the same person, for the evidence so warrants.) Defendant was informed that a right of way was desired over its land for the purpose of enabling Miller & Lux to irrigate its land without which privilege the object of the enterprise could not be effected; making no objection

36 Cal. App.—47

to plaintiff's surveying the route for the canal, or of enter-ing upon the work of construction in March, 1912, and with knowledge that work had begun, defendant commenced nego-tiations looking only, as expressed in one of its letters, to "something in exchange for this right of way which shall be commensurate with the value of the privilege you are seeking." For nearly four years these negotiations con-tinued without result, Miller & Lux in the meantime spend-ing large sums of money, and at no time did defendant object to plaintiff's going on with the work as originally contem-plated and as defendant knew it was being done, including work of excavation on defendant's land during the year 1912 and subsequent years. Defendant had a right of action the moment plaintiff entered upon defendant's land in 1912 to construct the canal, if not sooner. As early as May 13, 1912, Miller & Lux wrote defendant, saying: "We have a large force of men, teams, etc., engaged upon this work and it is desirable that we have an understanding as early as practicable, as the construction will soon be up to your land." It seems to us that if defendant was not called upon at an earlier period to do so, it should at this time have made it clear that before extending the canal over its land the question of compensation must be settled. If defend-ant regarded plaintiff's operations as an unwarranted tres-pass upon its rights and without its consent, in fairness to plaintiff, defendant should have warned plaintiff to desist from encroaching upon its land pending settlement of the question of compensation. Defendant was informed, early in the correspondence, that the project would entail an ex-penditure of one hundred thousand dollars. It stood by and saw eighty thousand dollars of this sum expended and then for the first time made known its opposition. It seems to us that every principle of equity forbids the court of chan-cery to aid defendant, and that the injunction granted at defendant's request is not supported by the evidence. Its remedy is at law for damages.

Some testimony was introduced by defendant tending to show that the taking of water from the San Joaquin River would interfere with its use by previous appropriators, and it could be used on much better land than that proposed to be irrigated by Miller & Lux, and that the dependable water of that river was already fully appropriated. Also that in oper-

ating the canal defendant would be damaged by overflow and seepage of water on to defendant's land. We have not considered these phases of the case, as we regard them as immaterial.

The judgment is reversed.

Hart, J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on June 6, 1918.

Angellotti, C. J., Sloss, J., and Wilbur, J., dissented from the order denying a hearing in the supreme court.