[Civ. No. 2230. Third Appellate District.—April 14, 1921.]

EMMA S. STEPP et al., Respondents, v. JUDITH E. WILLIAMS et al., Appellants.

[1] WATERS AND WATER RIGHTS—APPROPRIATION OF WATERS OF SPRING —SUFFICIENCY OF EVIDENCE.—In this action to quiet title to the waters of a spring, the evidence is held sufficient to establish an appropriation by plaintiff's predecessor.

[2] ID.—WASTE WATERS OF IRRIGATION DITCH—RIGHT OF APPROPRIATION.—Waste waters of an irrigation ditch are of a vagrant or fugitive character, and so long as they remain so and are not controlled by the owner of the ditch they are subject to appropriation and use by others, but no usufruct can be acquired therein.

[3] ID.—CONVEYANCE OF WATER—STATUTE OF FRAUDS.—Water being a part and parcel of land to which it is appurtenant is real property, and a conveyance or an agreement to convey such an interest is within the statute of frauds and must be in writing.

[4] ID.—EXECUTED PAROL GRANT—SUFFICIENCY OF EVIDENCE.—In this action to quiet title to the waters of a spring, the evidence is held to establish an executed parol grant of the waters to plaintiff's predecessor.

[5] ID.—RIPARIAN RIGHTS — TITLE BY PRESCRIPTION. — As a general proposition, a riparian right cannot be acquired by mere use or lost by disuse unless there is such an invasion of the riparian rights of the party against whom title by prescription is claimed that he would have had a ground of action against the intruder.

[6] ID. — PAROL GRANT — ESTOPPEL. — Where defendants' predecessor made a parol grant of the waters of a spring, and plaintiffs' predecessor, acting thereon, constructed a ditch at an expense of approximately two thousand dollars and also maintained the ditch for several years at a large annual outlay of money and labor, the defendants are equitably estopped from denying the validity of the parol grant, although invalid because within the statute of frauds.

APPEAL from a judgment of the Superior Court of Modoc County. Clarence A. Raker, Judge. Affirmed.

The facts are stated in the opinion of the court.

Jamison & Wylie for Appellants.

Daly B. Robnett for Respondents.

HART, J.—The defendants own certain lands in Modoc County, California, upon which there is a spring, the waters of which flow over and across the lands of defendants; plaintiffs claim a four-fifths interest in the spring and in the waters flowing therefrom under an alleged oral grant from Chas. W. Williams, deceased, the predecessor in interest of defendants. Plaintiffs brought this action to quiet their alleged title to the waters of said spring, and for an injunction restraining defendants from interfering with the said waters claimed by plaintiffs. Defendants, Judith E. Williams, both in her individual and representa-

5. Nature of riparian rights, notes, 9 **Ann. Cas.** 1235; **Ann. Cas.** 1913E, 709; **Ann. Cas.** 1915C, 1026.

tive capacity, and Gary Williams, answered said complaint, denying the allegations of the complaint as to the grant of said waters of said spring, and by way of cross-complaint alleged the ownership of said spring and the lands on which the same is located, and a right and title to said spring by reason thereof, and by reason of their riparian rights and by prescription.

The court, in substance, found as follows: The spring, the right to the waters of which is in controversy here, is situated on the lands of the defendants, who, as to said lands, are the successors in interest of one Charles W. Williams. Continuously from and including the year 1882 to the time of his death on the twenty-fifth day of February, 1918, said Williams was the owner and in the occupancy of the land on which the spring in question is situated.

In the year 1883 Charles W. Wells, who was and at the time of the commencement of this action deceased, but in the year just named the husband of Emma S. Stepp, one of the plaintiffs herein, made homestead entry of certain land and also a desert land entry of certain other land, and after due proceedings received a patent therefor from the United States government, all said lands, as well as the plaintiffs' land upon which the said spring is located, being situate in Modoc County. The plaintiffs are the successors in interest of said Wells in the homestead and desert entries above mentioned. The said lands of plaintiffs "are all of a dry, barren nature, and would not produce crops in paying quantities without artificial irrigation, and the said lands would be of little or no value without such irrigation, and at the times said lands were entered by said Charles W. Wells said lands were of this character, all of which was well known to said Charles W. Wells"; that either in the year of 1882 or of 1883 said Williams "told Charles W. Wells, husband of said plaintiff, Emma S. Stepp, that he, the said Wells, could have the said spring and the waters running therefrom, except a small quantity of water required by the said Charles W. Williams, not exceeding forty inches, measured under a four-inch pressure." Wells and his wife, plaintiff Stepp, relying upon the offer of the waters of said spring so made to Wells by said Williams, thereupon "commenced the construction of a levee around said spring to restrain the

waters thereof from flowing on to the lands of said Charles
W. Williams, and commenced the construction of a ditch
leading from said levee and spring to the lands of said
Charles W. Wells and said Emma S. Stepp, . . . and
diligently prosecuted the work of constructing said levee
and ditch until the same was completed, and upon the
completion of said levee and ditch said Charles Wells
diverted and appropriated all the waters of said spring and
the stream issuing therefrom, except forty inches, measured
under a four-inch pressure, so reserved by said Charles W.
Williams, and by means of said ditch conveyed the same
to the aforesaid lands of said Charles W. Wells and plain-
tiff, Emma S. Stepp, his wife, and applied the same to a
beneficial use in the irrigation of said lands and the pro-
duction of valuable crops, and for stock and domestic
purposes, as hereinbefore found"; that the ditch so con-
structed by said Wells and his said wife was of an average
width of five feet and of an average depth of two feet,
and was and is between six and eight miles in length; that
it required a period of five years to complete the construc-
tion of the ditch, during which time said Wells devoted
"all the time and money he was able to devote to the
construction of the same," and the cost of the original con-
struction of the dam and ditch was approximately $2,000;
that after being told by said Williams that he might have
the said spring and water said Wells proceeded to clear
a portion of his lands, and planted an orchard, consisting
of two or three dozens of fruit trees, and also planted
about three hundred acres of said lands in crops of hay,
grain, and alfalfa, all of which required artificial irriga-
tion, and for which said Wells had no supply of water ex-
cept from the said spring; that said Wells expended large
sums of money in improving the said property by fencing
the same and constructing other improvements thereon,
"all of which said improvements would be useless unless
said Charles W. Wells was able to cultivate said lands and
irrigate the same and produce crops thereon; that all of
said facts were known to and by the said Charles W. Will-
iams and said . . . Williams was at all times apprised of
the work that said . . . Wells was doing and having done
in the construction of said ditch and dam, and in the
clearing and cultivating of said lands, and the diversion,

appropriation, and use of said waters of said spring by said . . . Wells, as aforesaid''; that the use of 100 inches of the waters of said stream and spring by the said Wells was at no time interrupted by said Williams.

That the original amount of water "appropriated and diverted" by Wells from said spring "under grant of right" from Williams was "at least 125 inches, measured under a four-inch pressure," but Wells, on the sixteenth day of May, 1884, granted by a deed of conveyance to one Wm. H. Nelson, the owner of certain lands over which the said ditch was constructed, "or was to be constructed," an undivided one-fifth interest in and to said ditch and the said water right, since which time Wells and his successors in interest have claimed, diverted, and used as their own, "and under their own right," 100 inches of said spring and stream, measured under a four-inch pressure, "over and above any and all interest in and to the waters of said spring which they had theretofore deeded to the said William H. Nelson."

That the plaintiffs and their predecessors in interest, for over thirty years from the time of the completion of the dam and ditch by means of which they diverted and used the waters of said spring to the time of the commencement of this action, have "continuously, uninterruptedly, openly, notoriously, under a claim of right, and adversely to the defendants and their predecessors in interest, and adversely to said Charles W. Williams, and with the knowledge and acquiescence of said . . . Williams, diverted, appropriated, claimed, and used, 100 inches of the waters of said spring and stream . . . upon the aforesaid lands for the irrigation thereof and for the production" of the crops above mentioned and for stock and domestic use; that during all said time said number of inches of water "have been necessary and indispensable for the proper irrigation of said lands and for the production of said crops," etc.

It is further found that ever since the completion of said dam and ditch the plaintiffs and their grantors have cleaned and maintained the ditch every year, at an annual cost of $250, and that said work of "cleaning and maintaining" has been open and notorious and was within the knowledge of said Williams during his lifetime, and with-

out objection, interference or interruption by him or his agents.

It was found that the payment of all taxes of whatsoever kind and nature assessed or levied against the lands of plaintiff and against the ditch and water right in question for more than five years continuously immediately preceding the commencement of this action had been made by plaintiffs.

The court also found that the waters of the spring were riparian to the lands of the defendants, but the riparian rights of the latter thereto to the extent of 125 inches, measured under a four-inch pressure, ceased to exist by virtue of the grant of said waters to the plaintiffs and their grantors, etc. But it was also found: "That during the years 1882, 1883, and 1884, a great deal of the lands of the said Chas. W. Williams lying below and west of the said spring were saturated with water and were swamped, and were thus rendered unfit for cultivation, and said defendants' predecessors in interest required no water for the irrigation of said lands; . . . , that the lands of said defendants and the crops growing upon the same will not dry up and wither away, or not mature, nor will the said lands, nor the whole thereof, or any part thereof become unproductive or of little value, nor will defendants be compelled to abandon the cultivation of said lands (as alleged in the complaint), if they are deprived of the said 100 inches of the waters of said spring," etc.

The judgment awards to plaintiffs the first 100 inches of the waters flowing from said spring and the stream, measured under a four-inch pressure, and quiets their title thereto, and enjoins defendants or their agents, etc., from interfering with or in any manner obstructing the right of the plaintiffs to take and divert in the manner described by the findings said number of inches of the waters flowing from said spring.

This appeal is from said judgment by the alternative method (Code Civ. Proc., secs. 953a and 953b).

The findings above recapitulated are attacked upon the ground that there is no evidence to provide them with the requisite support. The several assignments under this head constitute the principal bases for the claim that the judgment should be reversed.

A vast amount of evidence, both for the plaintiffs and the defendants, was received in the case. We have examined it with care, and upon such examination we have found no reason for doubting that the findings are sufficiently supported. To enter here upon a detailed examination of the evidence would involve a task which would require an extended statement herein of the testimony, and we will, therefore, in a general way only refer to the testimony, except in an instance or so where specific reference to the testimony of some particular witness may be deemed essential to or at least proper for the purposes of the decision. As in nearly all cases, where the question as to the sufficiency of the support of the findings afforded by the evidence is an issue submitted on appeal, there is here, as to some of the essential points, a substantial conflict, and, as learned counsel concede, in such a situation as to the proofs a reviewing court is required to leave the determination of such conflict precisely where the constitution has placed it, viz., with the tribunal before which the proofs have been directly adduced. But there are certain of the essential facts as to the existence of which in this case there is neither any controversy here nor, consequently, a conflict, but which counsel for appellants earnestly contend do not establish a legal right in the plaintiffs to the waters or any portion thereof of the spring in question.

It should first be explained that both Charles W. Williams, the original owner of the land on which the spring the right to the waters of which is here in controversy is located, and the predecessor in interest of defendants, and Charles W. Wells, who located and owned the lands now owned by the plaintiffs and to and for the benefit of which the plaintiffs claim the right to take the waters of said spring, were deceased at the time of the commencement of this action; that Judith E. Williams, defendant executrix, and Gary Williams, her codefendant, are, respectively, widow and son of said Charles W. Williams; that plaintiff Emma S. Stepp is the widow of Chas. W. Wells, deceased, she, however, having intermarried with one Stepp after the death of said Wells, and that the plaintiff Mary V. Graham is the daughter of said Emma Stepp by her former husband, Wells.

In considering the evidence it will be convenient and perhaps less apt to be confusing to designate the lands of plaintiffs and the ditch constructed for the purpose of carrying the waters of said spring to said lands as the "Wells lands" and the "Wells ditch," respectively.

As the findings show, the spring in controversy is located in a corner of the Williams lands, which are, of course, riparian thereto. There are two springs in near proximity to each other, one being referred to in the testimony as the North or Warm spring and the other the South spring, the latter spring being also on the Williams lands. It is from the North or Warm spring that the plaintiffs claim the right to take and divert and convey the waters to their lands.

It should further be explained that there is testimony tending to show that a considerable portion of the Williams land situated near these springs was of a swampy or marshy character and that, therefore, as to that portion of said land, there was no necessity for artificial irrigation. There was, however, a small acreage of the Williams lands near the springs, variously estimated by the witnesses as embracing from thirty to forty acres, which, to make it productive, did require irrigation at the time of the alleged gift of the waters of the North spring by Williams to Wells.

The Williams and the Wells lands, as well as lands owned by other parties, were situated not far distant from Pitt River. Much of the Williams lands was irrigated by means of a large ditch through and by which the waters of said river were diverted and used for agricultural purposes. There were several thousands of acres of land irrigated by means of this ditch (generally referred to by the witnesses as the "Big ditch"), the lands so irrigated being owned by different parties, including, as stated, the Williams lands. These lands were situated east and northeast of the Wells ditch, and the evidence shows that in irrigating said lands from the "Big ditch" a large quantity of the waters diverted through said ditch would get away and become "waste waters," which flowed sporadically—that is, whenever particular lands entitled to the use of said waters were being irrigated—toward the

Wells ditch and would ultimately seep thereinto, very often in sufficient quantities to overflow the last-named ditch,

There is no dispute as to the fact that the climate in the locality in which the lands of the plaintiffs are situated is of extreme aridity, and that, consequently, said lands are dry and barren and would be wholly useless and worthless for the production thereon of the usual agricultural crops and garden truck without artificial irrigation.

It is also undisputed that in the year 1883, when Wells made the homestead and desert land entries mentioned in the findings, the lands which were thus taken up by him were covered with sagebrush, the removal of which, to render said lands available for practical agricultural purposes, was absolutely necessary. The evidence discloses that, having in mind the location of these lands, Wells first set about to find a water supply for the irrigation of the same, and, according to the testimony of the witness Cable, had a conversation with Charles W. Williams, the predecessor of the defendants, in which said Williams said to Wells that if he (Wells) could raise the dam then surrounding the spring in question to such a height as would facilitate the flow of the waters therefrom into a reservoir or ditch he could have all the water of said spring, except a quantity sufficient to irrigate the thirty or forty acres near the spring, referred to in the findings, for the purpose of irrigating his lands and for domestic purposes. This conversation occurred before Wells had taken decisive steps looking to the due location of the lands. It is further made to appear by the evidence that, acting upon and accepting this offer by Williams, Wells immediately proceeded to construct a ditch connecting the spring with his lands. The distance between the spring and the said lands is approximately seven miles. It appears that he was a man of limited means and as a result was required to prosecute the work of construction with a degree of diligence only which was commensurate with his financial ability. The consequence was that the work of constructing the ditch covered a number of years. In fact, the undisputed evidence is that Wells began the work of building the ditch in the year 1883 and finished it in the year 1888, the total cost thereof, not including the labor

he himself bestowed upon the work, being approximately $2,000.

After the completion of the ditch, Wells, on the twentieth day of October, 1888, filed and on the same day caused to be recorded in the office of the county recorder of Modoc County a written notice whereby he gave notice that he had "appropriated all the water from the springs commonly known as the Williams Springs situated in the [describing the Williams lands] . . . to the extent of 400 inches of water measured under a four-inch pressure." Said notice was also at that time posted at the spring in question, the point of diversion of the waters thereof.

· The ditch, as constructed, passed over and through a portion of the land of Williams and in close proximity to the latter's residence. The ditch also passed through and over a portion of the land of one W. H. Nelson, which adjoined the lands of Williams, and, as the findings show, Wells, as a consideration for the right to run the ditch over and through the land of Nelson, conveyed by deed to the latter a one-fifth interest in said ditch and the water right connected therewith. This deed was recorded in the office of the county recorder of Modoc County, at the request of said Nelson, on the second day of June, 1884. It may also be stated here that Williams, having later become the owner by purchase of the Nelson land over which said ditch passes, likewise became the owner of Nelson's one-fifth interest in the ditch and the water right.

The undisputed evidence also shows that, while the work of constructing the ditch was in progress, Wells made material and extensive improvements on his lands, erecting thereon a house in which to live, erecting fences around the lands, removing the sagebrush thereon and otherwise putting the lands in a condition suitable to use for agricultural and other like purposes. He planted a small orchard on the land and raised a limited amount of garden products and produced alfalfa and cultivated the wild hay growing thereon. The water for these purposes, prior to the completion of the ditch, was hauled to the lands by Wells, by what particular means the record does not disclose.

As stated, the work of building the ditch was completed in the year 1888, from which time until after the death of C. W. Williams, which occurred on the twenty-fifth day of

February, 1918, Wells and his successors in interest have continuously diverted to and used upon their lands the waters of said spring for irrigating, stock, and domestic purposes.

There is testimony by a large number of witnesses—persons who had either been employed on the Wells ranch or at times had been in possession of it under leases—that the water from the spring was diverted by means of the ditch in question to and used upon said ranch in the irrigation of from 200 to 250 acres thereof for upward of thirty years or more without molestation or protest from or by Charles W. Williams. The same witnesses, as well as Mrs. Stepp and her son, testified that every year during the period above mentioned, Wells and, subsequently to his death, Mrs. Stepp, caused the ditch to be cleared of moss growing and debris accumulating therein from one end of the ditch to the other—that is, from the Wells ranch to the spring—and that the expense each of said years of performing that work averaged in money the sum, approximately, of $250. Some of the work of clearing the ditch of the obstructions which impeded the free passage of the waters of the spring through the ditch to said ranch necessarily was done on the portion of the Williams land over which the ditch passes and, as seen, near the residence of Williams, and the witnesses just referred to testified that at no time did C. W. Williams or any member of his family, or anyone acting for him, ever interfere with or protest against such work being so done either on his premises or at the springs. In fact, it appears that on one occasion when Wells was building the ditch and before its completion, Williams, at the request of Wells, performed some work on the ditch near the spring, for which Wells compensated him to the extent of $27 or thereabouts. On another occasion, Mrs. Stepp testified, said Williams was present while she had some Indians cleaning the ditch, and at that time Williams not only did not protest against the cleaning of the ditch but had an Indian employee of his, who was with him at the time, to show the other Indians how to do the work properly. In brief, as to C. W. Williams' attitude relative to the maintenance of the ditch, there is evidence showing or at least plainly tending to show and sufficient to support a finding to that effect, if the trial

court believed it, that Williams, down to the day of his death, all along regarded his gift or grant of the waters of the spring to Wells, except the small quantity reserved for the irrigation of some thirty-five or forty acres of his own land, as perfectly valid and that the right to said waters or the use thereof had and was vested in Wells. For instance, on one occasion, many years after he had given said waters to Wells and while the latter was using the same through and by means of the ditch constructed by him, Williams, in a conversation with the witness Layton, in a way expressed regret that he had given the waters of the spring to Wells, explaining that when he parted with his right to the waters flowing from the spring he had no use for all said waters, but that since then conditions had changed so that the said waters would "now come in very handy" to him. In this same conversation he further explained to the witness that many years prior to the date of said conversation Wells had said to him (Williams) that he contemplated constructing a ditch whereby he could convey water for irrigation to the lands he proposed to locate from Pitt River; that he (Williams) then said to Wells: "There's no use of your going to that expense; if you can raise the dam at this spring so as to get the water therefrom into a ditch, you may have the water, except a small amount for irrigating the thirty or forty acres of my own land lying near the spring," or words to that effect.

It further appears that in the years of 1916 and 1917 a controversy arose between the plaintiff and the Williamses over the waste waters flowing from the "Big ditch," some of which, as seen, would on occasions drift into a swale near the Wells ditch and thence by seepage into said ditch, often filling the same to the point of overflowing. The Williams people claimed that the plaintiffs were entitled to no part of said waste water and insisted upon their right to impound the same for their own exclusive use and purposes. Williams, it appears, had constructed a flume across the Wells ditch for the purpose of conserving said waste waters and thus had prevented the flow of the same into said ditch. A conversation occurred early in the year 1917 between the plaintiff, Emma S. Stepp, and Gary Williams, one of the defendants, and in the presence of the witness Graham, a

Mr. Hughes, son-in-law of C. W. Williams, and the attorney
for the plaintiffs. In that conversation, so Mrs. Stepp and
Graham testified, Gary Williams stated that the right of
Mrs. Stepp to the waters of the spring was not disputed
by him or any of his family; that they knew that the plain-
tiffs owned the waters of the spring, but as to the waste
waters from the "Big ditch" they did not know whether
plaintiffs owned them or not, but that they (the Williamses)
were of the belief that they owned the waste waters.

There is testimony that the spring in question was the
only available source affording a definite supply of water
of a sufficient flow for the necessary irrigation of the Wells
lands; that the Wells ditch, if kept clean and free from
sediment and other obstructions, has a carrying capacity of
at least 200 inches of water; that for many years—in fact,
continuously from the time that the ditch was completed
down to the time of the obstruction thereof by the damming
up of the ditch by the defendants in August, 1918 (after
the death of C. W. Williams)—at least 125 inches of water,
measured under a four-inch pressure, over and beyond the
thirty-five or forty inches of water, likewise measured, which
the court found that Chas. W. Williams had reserved for
use on the thirty-five or forty acres referred to above,
flowed into the ditch from said spring and thence to the
lands of the plaintiffs; that, as seen, one-fifth of said amount
of said waters (twenty-five inches thereof) was conveyed
by Wells to William H. Nelson; that the amount of the
water so conveyed and reaching the lands of plaintiffs was
necessary for the proper irrigation of fruit trees, crops of
hay, and garden truck produced thereon and for stock and
domestic purposes. It is true that there was no testimony
introduced showing that an exact measurement had ever
been made of the waters flowing through the ditch from
the spring, but a civil engineer did testify that the ditch,
at a certain point therein, was capable of carrying five or
six hundred inches, while there was other testimony, based
upon the observations and judgment of those thoroughly
acquainted with the ditch for many years, to the effect that
100 inches were required for the necessary uses of the plain-
tiffs, and that the latter, until their ditch was interfered
with in the year 1918 by the defendants, as above explained,

always secured all the water necessary or requisite for sufficiently irrigating from 200 to 300 acres of their ranch.

[1] The above rather general *résumé* of the evidence is taken mainly from the testimony of witnesses introduced by the plaintiff and is clearly confirmatory of the declaration made in the outset hereof that the findings are well supported. Indeed, as above suggested, there is upon some of the points little if any substantial variance between the testimony received upon behalf of the plaintiffs and that of the defendants. The latter themselves in effect admitted that some water from the spring in question had continuously for many years been diverted from the spring into the Wells ditch and thence to the Wells ranch. They claimed, however, that the said ditch, because of not being of the proper grade, was incapable of carrying more than thirty or forty inches of water from the spring to the Wells ranch, and that thus no greater number of inches of water from the spring had ever been diverted into the ditch. This testimony, however, was based upon observations made just before this action was commenced and at a time when the defendants had refused to permit the plaintiffs to go upon their land, as the latter had always theretofore done without being interfered with, for the purpose of clearing the part of the ditch thereon of such obstructions as had accumulated therein during the months the ditch was not in actual use. And, in this connection, this pertinent suggestion may well be ventured: That it is not probable that Wells and his successors, who own approximately 300 acres of land wholly worthless for agricultural purposes without artificial irrigation, would have constructed at an expense of $2,000 and maintained at a yearly cost of approximately $300 a ditch the carrying capacity of which would not exceed thirty inches of water, which, according to the testimony, would irrigate not to exceed thirty or forty acres of land. But, be that as it may, upon the question of the carrying capacity of the ditch there is, as we have shown, positive testimony for plaintiffs in direct conflict with the testimony for the defendants last referred to. There is the further claim, though (and this was the main theory upon which the defendants resisted at the trial the right of plaintiffs to more than thirty or forty inches of water from the spring, if any at all), that by far the greater portion of

the water carried to the Wells ranch through the latter's ditch was from the waste waters escaping from the "Big ditch." But, as in rebuttal of that proposition of fact, the plaintiff showed, even by one of the defendants and some of their other witnesses, that the said waste waters were subject to such control by the owners of the "Big ditch" as that they could be and often were diverted from the Wells ditch and, therefore, could not get into that artificial waterway. As we have seen, there were several times when the certain lands entitled to irrigation from the "Big ditch" were being irrigated the waste waters therefrom would flow in a different direction from the Wells ditch and would never reach said ditch. Gary Williams, one of the defendants, testified that he could so manipulate the "Big ditch" that when irrigating from it he could either overflow the Wells ditch or make it dry. In a word, from the testimony for the plaintiffs as well as from some of that for the defendants it is a reasonable inference to say that the Wells ditch was supplied with the waste waters from the "Big ditch" only periodically or whenever it might happen that certain lands entitled to be irrigated from the latter ditch and which sloped toward the Wells ditch were being irrigated. [2] These waste waters were of a vagrant or fugitive character, and while so long as they remained so or were not controlled by the owner of the ditch from which they escaped they were subject to appropriation and use by others, an usufruct could not be acquired therein (*Dannenbrink* v. *Burger,* 23 Cal. App. 587–596, [138 Pac. 751].); hence, the plaintiffs could not rely upon them as providing a source for a definite or continuous supply of a sufficient quantity of water for their necessary purposes, and it is not reasonable to suppose from the evidence that they intended to do so when they built their ditch. Indeed, as is plainly evident, the construction of the ditch to the spring and the building of a dam around the spring in a manner to permit the flow of the waters of the spring into the ditch are themselves convincing evidence of the fact that plaintiffs expected and intended to rely for their water supply wholly upon the spring. But at all events, it is clear that upon this point, as well as upon all the other vital facts, there at least exists a substantial conflict in the evidence.

As before stated, the fixing of quantities as to the waters flowing from the spring and those customarily carried therefrom by the ditch to the lands of plaintiffs is based upon testimony involving the opinions or the best judgment of those familiar with the spring and the ditch and generally with the requirements as to water for irrigation purposes under the conditions shown to exist in the locality in which the lands of plaintiffs and those of the defendants are situated. There were no exact measurements shown. In such a case more or less difficulty in defining the precise rights of the parties is always to be expected and the court can do no more than to exercise and apply its best judgment under the circumstances as shown in arriving at a conclusion as to what is just and right as to both the contending parties. To this end it may draw such inferences from all the testimony and the general situation as the same may reasonably afford. Here (and we are now speaking of the quantity of water awarded to plaintiffs) we have testimony showing the capacity of the ditch, the amount of water in bulk it has usually conveyed to the lands of plaintiffs in the irrigating seasons, the number of inches required to irrigate a certain area, the number of acres irrigated by plaintiffs, and an approximation of the quantity of water which ordinarily flows from the spring into the ditch. From all these facts the court could form a fair and reasonable judgment and conclusion as to the quantity of the waters of the spring to which the plaintiffs are entitled and at the same time allow to the defendants enough of said water to measure up to the reservation made by C. W. Williams, and this we conclude, after a careful reading of the testimony, it has done. Indeed, it has done more, for it has given to the defendants thirty-five inches of water in excess of the amount which was reserved by their predecessor from the alleged grant of the waters of the spring to Wells.

We are now brought to a consideration of other legal points arising and involved in this controversy.

The plaintiffs contend that the evidence and findings show that C. W. Williams conveyed to their predecessor in interest by an executed parol grant the waters of the spring in question and that also they acquired a title to said waters by adverse user or prescription. On the other hand, the defendants, in addition to the contention that the findings

derive no support from the evidence, of which proposition
we have already disposed adversely to their position, main-
tain that, inasmuch as the plaintiffs' predecessor did not
take actual possession of the waters of the spring until some
five years after the alleged grant of the waters of the spring,
there was not, and could not have been, an executed parol
grant of said waters; that the alleged grant is, therefore,
void, since water, being a part and parcel of the land to
which it is appurtenant, is real property, which cannot
be transferred or granted except by an instrument in writ-
ing. (Code Civ. Proc., sec. 1971.)  Or, it is further con-
tended, if the transaction amounted only to an executory
oral agreement to convey the water, the transaction or
agreement is still void, since it is also the law that an agree-
ment to convey real estate or any interest therein, to be
valid or of legal force, must be reduced to writing. (Code
Civ. Proc., sec. 1973, subd. 5.)

[3]  There is no legal proposition better settled in this
state than that the interest here claimed by the plaintiffs
is an estate in real property, and that a conveyance or an
agreement to convey such an interest is within the statute
of frauds and must, therefore, be in writing.  (*Hayes* v.
*Fine,* 91 Cal. 391, 398, [27 Pac. 772], and cases therein
named; *Churchill* v. *Russell,* 148 Cal. 1, 4, [82 Pac. 440].)

[4]  It is believed, however, that the gift of the waters
to the predecessor in title of the plaintiffs involved an exe-
cuted parol grant of said waters.  It is true that Wells
did not, upon being given the right to the waters of the
spring, proceed immediately to use the same.  In the very
nature of the case this was impossible.  But he did proceed
at once with the preliminary preparations essential to the
putting of the waters to use and prosecuted those prepa-
rations as expeditiously as the circumstances and condi-
tions and the nature of the grant would permit, and this,
we think, was sufficient in such a case as this to constitute
an executed parol grant.  However, if that position were
logically assailable, it would seem to us that there can be
no doubt that the evidence establishes in the plaintiff title
to the waters by prescription or adverse user.

In the first place, it is to be noted that in the year 1888
Wells posted a notice of the appropriation of 400 inches
of the waters of the spring at the spring, the point of diver-

sion of said waters, and caused said notice to be recorded in the office of the recorder of Modoc County. From that time on and until interrupted in the diversion of said waters by defendants in the year 1918 he and his successors, under a claim of right, continuously, openly, notoriously, and, indeed, with the actual knowledge of Charles W. Williams and the defendants here, diverted and conveyed to his ranch by means of the ditch the waters of said spring, or so much thereof as was necessary for their purposes. Here, then, is clearly shown a prescriptive right, since such use under such circumstances would carry with it a presumptive grant —that is, such use involves all the elements of a prescriptive right to said waters by adverse user. (*Roseberry* v. *Clark,* 23 Cal. App. 549, 557, [138 Pac. 923]; *Faulkner* v. *Rondini,* 104 Cal. 140, 146, [37 Pac. 883].) **[5]** In stating this conclusion, we are not unmindful of the general proposition that a riparian right cannot be acquired by mere use or lost by disuse, by which it is meant, as we understand that doctrine, that unless there is such an invasion of the riparian rights of the party against whom title by prescription is claimed that he would have had a ground of action against the intruder, no prescriptive title to such waters can arise or be established. (*Faulkner* v. *Rondini, supra.*) We have here, however, not only the invasion by a non-riparian owner of the riparian rights of the defendants but an invasion of which the riparian owners had actual knowledge, and such an invasion as would have constituted a ground of action in his favor against the invader. Upon what theory may it be held that thus a prescriptive title to the waters in question is not established, such invasion having more than covered the statutory period of five years prescribed for the acquisition of such a title or title by adverse user or possession? Indeed, we think we are justified in holding, upon this record, that the plaintiffs have established a parol grant, followed by adverse user. (*Roseberry* v. *Clark, supra.*)

**[6]** But this case may, in strict harmony with the evidence and the findings, be considered upon the theory that the use of the waters of the spring by Wells and his successors, the plaintiffs herein, was under a license from the predecessors in interest of the defendants, and that the better doctrine of the case, and one upon which it may

justly be decided in favor of the plaintiffs, involves an equitable concept whose animating principle is natural or abstract right and justice—a principle which justly discountenances or frowns upon transactions the consummation of which would work a gross injustice upon the rights of a person. The doctrine referred to is that of estoppel, which, while never operating to destroy the very salutary rules involved in the statute of fraud, will, upon the highest considerations of right and justice, deny to individuals the privilege of invoking the protection of that statute where their acts and conduct in a transaction with others would render the statute a shield to rather than a prevention of manifest injustice, or, in other words, the pervention of acts which would work what in the eyes of equity would be a fraud upon the rights of another person.

The cases applying the doctrine referred to, where the proved facts and circumstances are such as we have in the instant case, are numerous, both in this and other jurisdictions, and among them are, notably, *Churchill* v. *Russell,* 148 Cal. 1, [82 Pac. 440]; *Stoner* v. *Zucker,* 148 Cal. 516, [113 Am. St. Rep. 301, 7 Ann. Cas. 704, 83 Pac. 808]; *Roseberry* v. *Clark,* 23 Cal. App. 549, [138 Pac. 923]; *Smith* v. *Green,* 109 Cal. 228, 234, [41 Pac. 1022]; *Blankenship* v. *Whaley,* 124 Cal. 300, 304, [57 Pac. 79]; *Flickinger* v. *Shaw,* 87 Cal. 126, 131, [22 Am. St. Rep. 234, 11 L. R. A. 134, 25 Pac. 268]; *Raritan Water Power Co.* v. *Veghte,* 21 N. J. Eq. 475; *Rerick* v. *Kern,* 14 Serg. & R. (Pa.) 271, [16 Am. Dec. 497]. See, also, comment of Professor Freeman on the last-named case in 16 Am. Dec., p. 501 et seq.

It is sufficient to refer specifically herein to a few only of the above cases to illustrate the application to a case of this kind of the equitable doctrine or principle mentioned.

*Churchill* v. *Russell,* as in the case at bar, involved the question of the validity of an executed parol license given by the plaintiff to the defendants to take the waters of a certain stream known as Butte Creek, in Siskiyou County. The plaintiff's predecessor in interest had, many years prior to the giving of said license, duly appropriated all of the waters of said stream. Before permission to divert the waters of the stream to their land was given by one Boyes, plaintiff's predecessor in title, the defendants had an interview with Boyes, in which they said to the latter

that they had an opportunity to purchase the homestead right of a man named Snell to certain land situated near the plaintiff's lands, and also stated that if he (Boyes) would grant to them the right forever to twenty inches of the waters of said creek they would purchase said homestead right and prove up on it. Boyes assented to that proposition and explicitly assured the defendants that, as he disliked Snell and would like to see him leave the community, they could have for all time the twenty inches of water asked for. The defendants purchased the Snell homestead right and proceeded with the work necessary for effecting the diversion to the land that they had thus acquired the said water and to make improvements upon said land. Several years thereafter the plaintiff, the successor in interest of Boyes, brought an action to restrain the defendants from diverting the waters of said creek. The supreme court, in deciding the case, declared that the plaintiff, if having knowledge or notice of the license by Boyes to defendants, would under the facts above stated be estopped from denying the latter's right to divert twenty inches of water from said creek to their land.

In *Stoner* v. *Zucker,* 148 Cal. 520, [113 Am. St. Rep. 301, 7 Ann. Cas. 704, 83 Pac. 810], Mr. Justice Henshaw, after reviewing some of the cases exemplifying the application of the principle, with characteristic clearness, thus summarizes the rule as applicable to cases similar in their facts to the one before us: ''The recognized principle, therefore, is that where a licensee has entered (upon the premises of another) under a parol license and has expended money, or its equivalent in labor, in the execution of the license, the license becomes irrevocable, the licensee will have a right of entry upon the lands of the licensor for the purpose of maintaining his structures, or, in general, his rights under his license, and the license will continue for so long a time as the nature of it calls for.''

The rule as it is stated in *Raritan Water Power Co.* v. *Veghte,* 21 N. J. Eq. 475, *supra,* as follows, is noticeably applicable to the facts of this case as proved and found: ''To the extent that the license is executed, equity will not disturb it or permit its revocation. · Where improvements of a permanent nature have been made by a person on his own land, the enjoyment of which depends upon a

right, recognizable by law, affecting the land of another, and to which his consent is necessary, and where such consent is expressly proved, or necessarily implied from the circumstances, and the improvements have been made in good faith upon it, equity will not permit advantage to be taken of the form of consent, although not according to the strict mode of the common law, or within the statute of frauds, and, to defeat such a purpose, will, upon a proper bill filed, enjoin the licensor from accomplishing his fraud, or when he asks relief it will be refused, or if granted, will be allowed merely in the shape of compensation, but protecting the right of the licensee.''

Without further quotation from the above-cited cases, all of which are illuminating upon the proposition in hand, it is to be said that the rule to the extent that it is announced in those cases is sustained by the courts of a majority of the American state jurisdictions. The case of *Kinsell* v. *Thomas,* 18 Cal. App. 683, [124 Pac. 220], while not as to the facts precisely this case, applies the doctrine to an executed parol grant of real property.

The findings, supported as we think by sufficient evidence, brings this case (as has already been stated) clearly within the rule as it is declared in the California cases and the New Jersey case above quoted. Here, as we have seen, the predecessor in title of the plaintiffs, relying upon the grant of the waters of the spring to him by the predecessor of the defendants, not only made valuable and expensive improvements upon his own land but went to great expense in digging a ditch for the purpose of securing the use of the waters so granted to him. Not only that, but he maintained the ditch and the dam around the spring for many years at a large annual outlay of money and labor and with the actual knowledge not alone of the predecessor of the defendants but of the defendants themselves. It seems to us that if there ever was a case where equitable estoppel should intervene to prevent injustice, this is the case, for it would be manifestly inequitable and unjust to permit the defendants, upon the facts as they were proved and found, to deny the validity of the parol grant or license (if under the facts the latter, technically, be the appropriate characterization of the transaction) upon which the plaintiffs rely for their title to the waters in dispute.

Another point made by the defendants is that they acquired the right to all the waters of the spring as against the plaintiffs by adverse user. What has been said above regarding the sufficiency of the evidence to support the findings constitutes a sufficient reply to this point. We may, in addition, say that even the defendants and their witnesses themselves admitted that during the irrigation season there was always more or less water from the spring flowing in the ditch. Moreover, the testimony is, as we have shown, that the plaintiffs always used the waters flowing in the ditch when they needed them. Of course, there are times when waters for irrigation are not needed or used by the owner thereof, but an adverse right cannot be acquired against the owner by a person using the waters at times when the owner does not require them for his own purposes. If the claimant has used the water at such times as he needed it, it is regarded by the law as a continuous use. (*Hesperia Land etc.* v. *Rogers,* 83 Cal. 10, [17 Am. St. Rep. 209, 23 Pac. 196]; *Silva* v. *Hawn,* 10 Cal. App. 544, 551, [102 Pac. 952].)

It is further objected that the findings and the judgment are fatally uncertain in that they fail to find and adjudicate the paramount right and define the right of the defendants.

We are of the opinion that the decree is, under the peculiar circumstances of this case, sufficiently certain and definite in the adjudication of the respective rights of the parties.

The court found that the natural flow of water from the spring was 175 inches, measured under a four-inch pressure. It also found, as seen, that the plaintiffs were entitled to the *first* 100 inches of the water of said spring likewise measured, and upon evidence by the defendants themselves that an inch of water to the acre would be sufficient to fulfill the terms of the reservation by their predecessor, that the defendants were entitled to forty inches, measured under like pressure, which were reserved by their predecessor when he granted the said waters to the predecessor of plaintiffs. These findings, as we have shown, are sufficiently supported evidentially. While the decree does not specifically state the amount of water that the defendants are entitled to take from the spring, it is obvious that if, as

the findings and the decree declare, the plaintiffs are entitled to 100 inches of said water, the defendants have available to them for their own use all the waters of the spring over and above the amount to which the plaintiffs are entitled, which amount, according to the findings, would be thirty-five inches in excess of the quantity to which the defendants are entitled under the reservation by their predecessor. While the court could just as well have specifically fixed the rights of the defendants in the decree, as it did those of the plaintiffs, still it is very clear that by the decree, viewed by the light of the findings, the defendants are made to know precisely what their rights in the spring are. The decree here is wholly dissimilar to those in the cases cited by appellant, of which *Watson* v. *Lawson,* 166 Cal. 235, [135 Pac. 961], may be given as an example. In that case the judgment merely declared that the defendants were entitled to "sufficient water for the proper irrigation of so much of their several lands as they have heretofore irrigated with such water." Obviously, such a decision cannot be upheld, since it is plain that by it to the defendants themselves was practically committed the determination of the quantity of water that they were entitled to.

We have found no reason for disturbing the judgment and it is, therefore, affirmed.

Burnett, J., and Prewett, P. J., *pro tem.,* concurred.