Filed 4/4/19

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO


| | |
|---|---|
| LILLI SHOEN, | B284374 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC486560) |
| v. | |
| JULIET ZACARIAS, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Teresa A. Beaudet, Judge. Reversed and remanded.

Schorr Law, Zachary D. Schorr, and Stephanie C. Goldstein for Plaintiff and Appellant.

Ervin Cohen & Jessup, and Allan B. Cooper for Defendant and Respondent.


\* \* \* \* \* \*

When a landowner grants someone permission to use her land, she generally retains the right to revoke that license at any time. (*Emerson v. Bergin* (1888) 76 Cal. 197, 201.) The landowner may nevertheless be estopped from revoking that license—and the license will accordingly become irrevocable for "so long a time as the nature of it calls for"—if the person using the land has "expended money[] or its equivalent in labor" improving the land "in the execution of the license." (*Cooke v. Ramponi* (1952) 38 Cal.2d 282, 286 (*Cooke*); *Stoner v. Zucker* (1906) 148 Cal. 516, 520 (*Stoner*).) Critically, however, the expenditure of money or labor can make a license irrevocable only if that expenditure is "'substantial,'" "considerable" or "great." (*Richardson v. Franc* (2015) 233 Cal.App.4th 744, 756 (*Richardson*); *Dinsmore v. Renfroe* (1924) 66 Cal.App. 207, 211-212 (*Dinsmore*); *Stepp v. Williams* (1921) 52 Cal.App. 237, 240, 257 (*Stepp*).) Here, we conclude that the trial court's grant of an irrevocable license was an abuse of discretion because the court construed the "substantial expenditure" requirement too permissively and used the wrong legal standard in declaring the license to be forever irrevocable. For these reasons, we reverse the grant of the irrevocable license and remand for further proceedings on the private nuisance claim.

## FACTS AND PROCEDURAL BACKGROUND

I.  **Facts**

A.  ***The disputed area***

Lilli Shoen (Shoen) and Juliet Zacarias (Zacarias) are neighbors whose backyards consist primarily of steep upward hillsides. At the top of Zacarias's hillside and midway up Shoen's is a flat patch of ground. The property line zigzags through this

flat patch.  Of this patch, 490 square feet are on Shoen's side of the line; the remainder is on Zacarias's.

Before either Shoen or Zacarias bought their parcels, someone had leveled out the flat patch, poured three concrete "meditation pads," and placed ornamental gravel on the patch. The prior owner of Zacarias's parcel had also installed steps made of railroad ties leading all the way up to the flat patch, while the prior owner of Shoen's parcel had installed railroad-tie steps leading two-thirds of the way to the flat patch but stopping about 20 to 30 feet shy of the patch.

**B.** ***Zacarias improves the flat patch while believing it was part of her property***

Zacarias bought her parcel in 2003.  She mistakenly believed that the entire flat patch was on her land.  Over the next two years, she (1) brought in contractors to grade the patch to make it flatter, (2) removed stacks of bamboo and cleared overgrown brush from the patch, (3) installed new ornamental gravel, (4) planted a low, 18-inch-tall hedge and built a foot-tall wooden fence around the perimeter of the patch, (5) populated the patch with a 10 foot-by-10 foot cloth cabana, a chaise lounge, a table and chairs, none of which is affixed to the ground and each of which remains movable, (6) installed underground electrical conduit from her house to the patch, and (7) installed sprinklers and then replaced them with a drip system in order to water the hedges on the patch.  Each of these improvements was made in 2003, 2004 or the early part of 2005.

### C. *Zacarias learns that a portion of the patch is not hers, and continues to maintain it*

#### 1. *Zacarias learns she does not own the entire patch*

In October 2005, the prior owner of Shoen's land did a survey of his property line and discovered that 490 square feet of the flat patch belonged to him ("the disputed area"). The prior owner shared this discovery with Zacarias, but told her she could continue to use the entire flat patch. The prior owner told Zacarias that his willingness to let her keep her furniture in the disputed area lasted only as long as he owned the property, and Zacarias understood as much.

#### 2. *The Shoen family buys the property and allows Zacarias's use of the disputed area to continue*

In 2006, the Shoen family trust acquired the parcel now owned by Shoen. At that time, the prior owner disclosed Zacarias's encroachment of the flat patch. Both Shoen and her father admitted knowing that the disputed area was on their land. From that time until April 2011, and in an effort to be a "good neighbor," neither the trustees of the Shoen family trust nor Shoen (who was living on the property) told Zacarias to stop using the disputed area.

In the latter part of 2011 and the early part of 2012, Shoen acquired the property from the Shoen family trust. In a series of letters sent first by Shoen's father in April 2011, then Shoen in April 2012, then Shoen's attorney in May 2012, the authors asked Zacarias to vacate the disputed area because Shoen desired to landscape the area. Zacarias ignored all of the letters.

4

### 3. *Zacarias's work on the disputed area between 2006 and 2011-2012*

During the period between the Shoen family trust acquiring the disputed area and its (and Shoen's) letters asking Zacarias to stop using that area, Zacarias spent time and money to keep the entire flat patch usable.  In particular, she (1) kept the trees near the patch trimmed, (2) cleared the brush on her hillside every year, (3) replaced the plants comprising the low ficus hedge when it died, (4) watered the hedges, (5) sometimes used the cabana's lighting or other electricity, and (6) re-upholstered the top of the cabana and the furniture.  Zacarias paid the gardener who trimmed the trees $130 per month for the upkeep of her entire parcel of land.  She paid laborers $700 per year to clear the brush on all of her land.  The new ficus hedge cost $2,350 to replace ($2,000 for the plants and $350 in labor).  Zacarias's average monthly electric and water bill for her house, swimming pool and entire yard was $1,200.

## II. Procedural Background

### A. *Complaint and cross-complaint*

In June 2012, Shoen sued Zacarias for damages, injunctive and declaratory relief on theories of (1) trespass, (2) nuisance, (3) ejectment, and (4) negligence.  Zacarias answered and counter-sued for damages and injunctive relief on theories of (1) prescriptive easement, (2) equitable easement and (3) nuisance based on Shoen's placement of two video cameras on Shoen's property that overlooked the disputed area as well as portions of the flat patch on Zacarias's property.

### B. *First trial on equitable easement and reversal*

Pursuant to the parties' stipulation, the case went to trial solely on the existence of an equitable easement.  The trial court granted Zacarias an equitable easement over the disputed area,

but we reversed after concluding that Zacarias had not proven that the hardship she would experience in moving her portable patio furniture was "greatly disproportionate" to the hardship on Shoen in losing use of her own property. (*Shoen v. Zacarias* (2015) 237 Cal.App.4th 16, 17-18 (*Shoen I.*)

**C.** ***Second bifurcated trial on irrevocable license and nuisance***

On remand, Zacarias asserted that she had an irrevocable license to use the disputed area based on Shoen's acquiescence to her use of the disputed area. Pursuant to stipulation, the case went to bifurcated trial, first on the issue of whether Zacarias's license to use the disputed area should be deemed irrevocable and, if so, second on the issue of whether Shoen's continued use of cameras to view that area would constitute a private nuisance.

1. *Irrevocable license trial and ruling*

During the bifurcated trial on the existence of an irrevocable license, the trial court did a site visit to the flat patch, heard testimony from Shoen, Zacarias and the former owner of Shoen's property, and admitted the prior testimony of Shoen's father. During her testimony, Zacarias "estimate[d]" that from 2003 onward she spent "[a]t least" $15,000 to $25,000 "to improve [and] maintain" the disputed area." This amount included $8,638.55 for the cabana and other portable furniture on the flat patch. It also included a portion of her monthly gardening, electrical and water bills that Zacarias calculated by dividing the square footage of her entire property (6,928) by the square footage of the disputed area (490).

The trial court ruled that Zacarias should be awarded an exclusive irrevocable license to use the disputed area and that this license would last forever, even after Zacarias sold the property. Although acknowledging that "some significant portion

6

of" Zacarias's estimate of the $15,000 to $25,000 "was spent *before*" Shoen acquiesced to Zaracias's use of the disputed area, the court nonetheless concluded that Zacarias had "spent substantial sums and physical labor for . . . landscaping, maintenance and care of the [d]isputed [a]rea" during the "six and possibly seven years" that Zacarias had used it with Shoen's acquiescence. The court further ruled that "the equities" "favor[ed]" granting the license not only to Zacarias but also in perpetuity to her successors-in-interest because the disputed area was "accessible from the Zacarias property" but did not "appear" to "provide any benefit to the Shoen property" because it was not viably accessible from that property. The court lastly ruled that this permanent license would also be exclusive due to the physical layout of the parcels and the parties' bad relationship.

2. *Nuisance trial and ruling*

Following further briefing, the court ruled that Shoen's two video cameras amounted to a private nuisance because they "constitute[d] a substantial and unreasonable interference with Zacarias's right to the use and enjoyment of" both the disputed area and the other portion of the flat patch owned by Zacarias. The court ordered Shoen to remove the cameras and prohibited her from installing any other equipment that would track the disputed area or Zacarias's property.

D. **Judgment and appeal**

Following entry of judgment, Shoen filed this timely appeal.

## DISCUSSION

Shoen argues that the trial court erred in granting Zacarias a perpetual irrevocable license and in declaring her placement of the two video cameras to be a private nuisance. We review the

7

trial court's ultimate decision to grant an irrevocable license and the duration of that license for an abuse of discretion, but review any subsidiary factual findings for substantial evidence and any subsidiary legal questions de novo. (*Richardson*, *supra*, 233 Cal.App.4th at p. 751; *Zellers v. State* (1955) 134 Cal.App.2d 270, 275 (*Zellers*); *City of Oakland v. Oakland Police & Fire Retirement System* (2014) 224 Cal.App.4th 210, 226.) We review a trial court's factual findings in support of its private nuisance ruling for substantial evidence, but the scope of any injunctive relief for an abuse of discretion. (*Vanderpol v. Starr* (2011) 194 Cal.App.4th 385, 397; *Van Klompenburg v. Berghold* (2005) 126 Cal.App.4th 345, 349.)

## I.     Irrevocable License

### A.     *Pertinent law*

When a landowner allows someone else to use her land, the owner is granting a license. (*Emerson*, *supra*, 76 Cal. at p. 201.) A license may be created by express permission or by acquiescence (that is, by "tacitly permit[ing] another to repeatedly do acts upon the land" "with full knowledge of the facts" and without objecting). (*Gravelly Ford Canal Co. v. Pope & Talbot Land Co.* (1918) 36 Cal.App. 717, 737; *Lusk v. Krejci* (1960) 187 Cal.App.2d 553, 555.) Although a license may generally "be revoked at any time at the pleasure of the licensor" (*Emerson*, at p. 201; *Bryant v. Marstelle* (1946) 76 Cal.App.2d 740, 746), a court may declare the license to be irrevocable "for so long a time as the nature of it calls for" if the licensee "'has expended money, or its equivalent in labor'" while reasonably relying on the existence of the license. (*Cooke*, *supra*, 38 Cal.2d at p. 286; *Stoner*, *supra*, 148 Cal. at p. 520; *Hammond v. Mustard* (1967) 257 Cal.App.2d 384, 389 (*Hammond*); *Belmont County*

*Water Dist. v. State of California* (1976) 65 Cal.App.3d 13, 18 (*Belmont County*).)

Critically, courts may exercise their power to declare a license irrevocable only if the expenditures in reliance on the license are "substantial," "considerable" or "great." (*Richardson*, *supra*, 233 Cal.App.4th at p. 756 ["substantial"]; *Noronha v. Stewart* (1988) 199 Cal.App.3d 485, 490 (*Noronha*) [same]; *Broads v. Mead* (1911) 159 Cal. 765, 768 (*Broads*) ["substantial loss"]; *Dinsmore*, *supra*, 66 Cal.App. at pp. 211-212 ["considerable"]; *Stepp*, *supra*, 52 Cal.App. at pp. 240, 257 ["great"]; *Stoner*, *supra*, 148 Cal. at p. 518 ["large and expensive"]; cf. *McCarthy v. Mutual Relief Asso.*, (1889) 81 Cal. 584, 588 ["trivial" expenditures will not suffice].) This particular requirement exists for two reasons. First, it mirrors a similar requirement in the doctrine of equitable estoppel, the doctrine that forms the "principal" rationale for our Supreme Court's recognition of a judicial power to declare licenses irrevocable. (*Cooke*, *supra*, 38 Cal.2d at p. 286 ["The principal basis" of this power "is the doctrine of equitable estoppel."]; *Stoner*, at p. 519 [same].) Just as a party seeking to invoke the doctrine of equitable estoppel must prove that she "*seriously* . . . change[d] [her] position in reliance" on the other party's conduct (*Monarco v. Lo Greco* (1950) 35 Cal.2d 621, 623, italics added; *Byrne v. Laura* (1997) 52 Cal.App.4th 1054, 1072; *City of Hollister v. Monterey Ins. Co.* (2008) 165 Cal.App.4th 455, 500 ["change of position" must be "of sufficient gravity to justify the intervention of equity"]), so too must the party seeking an irrevocable license prove that she *seriously* changed her position in reliance on the license by showing that her subsequent expenditures were significant. Second, the requirement of significant expenditures

9

ensures that courts use their power to create irrevocable licenses sparingly. (Accord, *Brevard County v. Blasky* (Fla. Dist. Ct. App. 2004) 875 So. 2d 6, 12 [irrevocable license "only arises under very narrow circumstances"].) This is critical because such licenses are functionally indistinguishable from easements (*Barnes v. Hussa* (2006) 136 Cal.App.4th 1358, 1370) and because courts are rightly reluctant to exercise "what is, in effect, the right of eminent domain by permitting [the licensee] to occupy property owned by another" (*Christensen v. Tucker* (1952) 114 Cal.App.2d 554, 560; see generally U.S. Const., 5th Amend. ["private property" "shall" not "be taken for public use, without just compensation"]; Cal. Const., art. I, § 19, subd. (a) [same]).

Courts have faithfully limited the exercise of their power to declare a license to be irrevocable to those situations in which the licensee has expended substantial amounts of money or labor in reliance on a license. Nearly every case where a license has been declared irrevocable has involved the licensee's permanent alteration of the land and the ensuing upkeep, whether by building, altering or upgrading a roadway (*Cooke*, *supra*, 38 Cal.2d at pp. 285-287; *Dinsmore*, *supra*, 66 Cal.App. at pp. 211-212; *Ricioli v. Lynch* (1923) 65 Cal.App. 53, 58), constructing a ditch, canal or levee to transport water (*Stoner*, *supra*, 148 Cal. at pp. 517-519 [ditch]; *Gravelly Ford*, *supra*, 36 Cal.App. at pp. 718, 721-722, 736-737 [canal]; *Stepp*, *supra*, 52 Cal.App. at pp. 239-240 [levee]), erecting a wall (*Noronha*, *supra*, 199 Cal.App.3d at p. 491), or raising living quarters (*Hammond*, *supra*, 257 Cal.App.2d at pp. 386-387 [cabins]). The high-water mark in this regard is *Richardson*, *supra*, 233 Cal.App.4th 744, which upheld an irrevocable license based upon the licensee's extensive acts of landscaping that entailed the installation of irrigation and

10

lighting systems; the purchase, planting and replanting of several large and expensive trees for more than two decades; and the daily watering and lighting of that landscaping. (*Id.* at pp. 748-749, 753, 756.)

**B.** *Analysis*

The trial court abused its discretion in granting Zacarias a perpetual irrevocable license for two reasons.

1. *Insufficient evidence of substantial expenditures in reliance on Shoen's implied license*

Although substantial evidence supports the trial court's findings that the prior owner of Shoen's property expressly granted Zacarias permission to use the disputed area and that Shoen (or her father) acquiesced to Zacarias's continued use of the area from 2006 to 2011 or 2012, substantial evidence does not support the court's finding that Zacarias expended substantial amounts of money or labor in the execution of either license. The sole evidence of Zacarias's expenditures was Zaracias's estimate that she spent "at least" $15,000 to $25,000 in improving and maintaining the flat area between 2003 and the present along with a handful of receipts to support her estimate.

Zacarias's estimate does not constitute substantial evidence of a substantial expenditure of money for two reasons. First, the estimate is over-inclusive temporally. The estimate includes *all* of Zacarias's initial improvements to the flat patch, even though Zacarias freely admitted that those improvements were made while she labored under the mistaken belief that the whole patch belonged to her and thus the improvements were not made in reliance on any license. Zacarias testified that the patio furniture and cabana cost her $8,638.55, but made no effort to quantify the other initial improvements, which, as noted above, also included hiring contractors to grade the patch, removing

11

bamboo and overgrown brush, replacing the ornamental gravel, installing sprinklers, installing four different types of lighting (electric and solar-powered), and buying and planting the first hedge. The trial court acknowledged that "some significant portion" of Zacarias's $15,000 to $25,000 estimate was incurred *before* Zacarias had any license, but the court did not explain how or why the remaining expenditures—that is, the portion attributable solely to upkeep *after* the license—was also significant.

Second, the estimate's calculation of the upkeep costs incurred in reliance on Shoen's license rests on faulty factual premises. Zacarias calculated the upkeep portion of her estimate as including (1) her monthly gardening bill of $130, (2) her annual brush clearing bill of $700, and (3) her monthly average electrical and water bill of $1,200, all proportionately reduced by the percentage of the size of the disputed area (490 square feet) over the size of her entire lot (6,928 square feet). The method Zacarias used to apportion her property expenditures was both mathematically and factually inaccurate. It is mathematically inaccurate because the mathematically correct way to determine the percentage of her bills attributable to the disputed area is to assess the size of disputed area (490 square feet) vis-a-vis the size of her entire lot *plus the disputed area* (7,418 square feet) because the bills necessarily included the cost to garden, water and light that area as well; the larger denominator makes the percentage attributable to the disputed area smaller. Zacarias's method was also factually inaccurate because it assumes that the use (and hence the cost) of gardening, electricity and water was spread evenly across her property. But this was simply not true as to, at a minimum, the electricity and water expenses: The disputed

patch would only use electricity for lighting at night or when Zacarias (or her tenants or guests) plugged something in, as compared with the main house and the pool which would use electricity for innumerable purposes and all the time; similarly, the disputed patch had a drip system to water the hedge, as compared with the main house (which would use water for bathing, washing clothes and dishes) and the pool.  Although our review for substantial evidence requires us to view the evidence in the light most favorable to the prevailing party (*Oregel v. American Isuzu Motors, Inc.* (2001) 90 Cal.App.4th 1094, 1100), it does not require blind acceptance of anything uttered during trial.  We must still assess whether the evidence is "substantial"—that is, whether it is "reasonable, credible and of solid value" (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651)—and an opinion that "does not rest upon relevant facts or which assumes an incorrect legal theory cannot constitute substantial evidence" (*Smith v. Workers' Comp. Appeals Bd.* (1969) 71 Cal.2d 588, 593).

Once Zacarias's estimate is discounted to correct its temporal and logical defects, what remains of the upkeep expenses is the share of the monthly gardening and annual brush clearing bills attributable to the disputed area, the even smaller share of the monthly electric and water bills attributable to the disputed area, occasionally replacing sprinkler heads, and the one-time $2,350 replacement cost of the ficus trees.  These upkeep costs are akin to other expenditures that courts have determined not to be "substantial."  (See, e.g., *Belmont County*, *supra*, 65 Cal.App.3d at p. 18 [cost of preparing plans and route surveys for construction; not substantial expenditure]; *Broads*, *supra*, 159 Cal. at p. 768 [cost to remove signs from outside of

13

building; not substantial expenditure]; *Heinkel v. McAllister*, 113 Cal.App.2d 500, 503-504 [cost to lay underground pipe; not substantial expenditure]; *Kaler v. Brown* (1951) 101 Cal.App.2d 716, 717, 719 [pouring two concrete strips used as a driveway; not substantial expenditure].) We do not consider the labor Zacarias claims to have invested in gardening because she did not testify to when or how much labor, and we do not consider the cost to re-top the cabana or reupholster some of the furniture because those costs inured to Zacarias's benefit (because the furniture is movable and can be used elsewhere), not the disputed area itself.[1]

In holding that Zacarias's modest costs of upkeep do not constitute "substantial" expenditures warranting an irrevocable license, we leave *Richardson* as the outer boundary of substantiality. In our view, this result is not only consistent with the legion of case law that precedes *Richardson* but also with the careful boundary staked out by those cases that runs between the sanctity of private property rights and the occasional need to do equity in derogation of those rights.

---

1       The trial court also seemed to find that Zacarias did not install permanent electrical wiring until 2007 or 2008 because Shoen only saw the cabana light attached to a "surge protected extension cord" when she visited the disputed area during that time frame, but the court's suggestion is not supported by substantial evidence because Zacarias testified that she installed all of the electrical *before* 2005 and because Shoen also testified that she saw electrical wiring up to the patch during the 2007 or 2008 visit. Construing the testimony in the light most favorable to the trial court's finding, Shoen's testimony indicates that Zacarias at some point after 2007 or 2008 ran a different wire from the patch's border to the top of the cabana, but this minor additional improvement does not alter our analysis.

14

Zacarias raises three arguments in response.

First, Zacarias argues that our prior conclusion in *Shoen I* that she was not entitled to an equitable easement is not dispositive of whether she is entitled to an irrevocable license. We agree. (Accord, *Richardson*, *supra*, 233 Cal.App.4th at pp. 753-754 [denial of equitable easement due to trespasser's knowledge of the trespass did not preclude award of irrevocable license].) However, Zacarias must still establish that she meets all of the requirements for obtaining an irrevocable license. She has not done so.

Second, Zacarias contends that one year of expenditures can be enough to render a license irrevocable. For support, she cites *Zellers*, *supra*, 134 Cal.App.2d 270. *Zellers* held that a landowner was entitled to an irrevocable license after he dumped 20,000 cubic yards of dirt on his neighbor's property and she did not object for a year. (*Id.* at pp. 272-275.) *Zellers* focused on whether the neighbor had acquiesced to the use of her land by saying nothing for a year; *Zellers* did not purport to hold that any expenditure for more than a year qualifies as substantial. (*Ibid.*)

Lastly, Zacarias asserts that she is not required to quantify a "specific dollar amount" of her expenditures. (*Richardson*, *supra*, 233 Cal.App.4th at p. 756.) She is nevertheless required to *prove* that her expenditures were substantial (Evid. Code, § 500 [party advancing claim or defense bears burden of proof]), and here she did not for the reasons we have explained.

2. *Abuse of discretion in granting an irrevocable license in perpetuity*

In fixing the duration of an irrevocable license, the license should "'continue for so long a time as the nature of it calls for.'" (*Cooke*, *supra*, 38 Cal.2d at p. 286.) This means the license should remain irrevocable "'for a period sufficient to enable the

15

licensee to capitalize on his or her investment.'" (*Richardson*, *supra*, 233 Cal.App.4th at p. 758, quoting 6 Miller & Starr, Easements 15:2, p. 15-15.) Thus, when a license to operate a mill or for drainage becomes irrevocable, it should last as long as the mill is operational or the need for drainage remains. (*Stoner*, *supra*, 148 Cal. at p. 520.)

The trial court abused its discretion in making any irrevocable license perpetual in duration for two reasons.

First and foremost, the court used the wrong legal standard. (*People v. Knoller* (2007) 41 Cal.4th 139, 156 [trial court abuses its discretion if its decision is based "on . . . an incorrect legal standard"].) Rather than look to when Zacarias would obtain the return on the investment *of her upkeep* occurring after she obtained a license, the court engaged in a wholly separate inquiry into who would make better use of the disputed area by balancing the greater value and utility of the disputed area to Zacarias (due to her ready access to the area) against the lesser value and utility of the area to Shoen (due to her less-than-ready access to the area). Not only is this the wrong test, but it is precisely the type of "free-floating inquiry into which party will make better use of the encroached-upon land, which values it more, and which will derive a greater benefit from its use" that we condemned as inappropriate in *Shoen I*. (*Shoen I*, *supra*, 237 Cal.App.4th at p. 21.)

Second, the proper analysis could not have yielded an irrevocable license that is perpetual in duration. This is not a case where Zacarias is seeking to obtain a license for long enough to obtain a return on her major investments in improving the flat patch because she made all of those improvements *before* any license was granted. The only investment to be recovered here is

16

Zacarias's annual investment in upkeep.  We decline to hold that a licensee's annual cost of upkeep, without more, warrants a perpetual license to recover the investment in upkeep; if we did, *every* irrevocable license would be perpetual.  Such a result effectively rewrites our Supreme Court's more nuanced and fact-specific test for fixing the duration of an irrevocable license.

In light of our analysis, we have no occasion to reach the other arguments raised by the parties with regard to the irrevocable license.

## II.    Private Nuisance

Although the terms of the parties' stipulation on remand (as summarized by the trial court) appear to make the issue of whether there is an irrevocable license dispositive of whether Shoen's cameras constitute a nuisance (because Shoen would have the right to videotape the disputed area if it was hers to use),[2] the trial court's nuisance ruling suggests that the cameras may constitute a nuisance even if Zacarias is not granted an irrevocable license (because the cameras are also aimed at the portions of the flat patch unquestionably belonging to Zacarias). Accordingly, we remand the nuisance claim for the parties to clarify with one another and with the trial court the effect of the stipulation and the scope of any injunctive relief yet to be granted.

---

[2]     The parties did not include the stipulation itself in the record on appeal.

## DISPOSITION

The judgment is reversed as to Zacarias's entitlement to an irrevocable license.  The judgment is reversed and remanded on Zacarias's nuisance claim.  Shoen is entitled to her costs on appeal.

### **CERTIFIED FOR PUBLICATION**.


_____, J.
HOFFSTADT

We concur:


_____, P.J.
LUI


_____, J.
ASHMANN-GERST

18