[Civ. No. 2419.   Third Appellate District.—April 24, 1922.]

## IRRIGATED VALLEYS LAND COMPANY OF CALIFORNIA (a Corporation), Appellant, v. D. J. ALTMAN et al., Respondents.

[1] CORPORATIONS — DISPOSITION OF LANDS—POWERS OF SECRETARY—BY-LAWS.—Where the by-laws of a corporation provide that it shall be "the duty of the secretary to negotiate all contracts for the purchase of lands, water power and water rights; to supervise the development and improvement of all lands belonging to the corporation, and to form and draw plans for the subdivision, general supervision and sale of lands, and to generally. supervise the sale, purchase, development and marketing of the lands of the corporation," the powers of the secretary, in so far as the authority to dispose of the lands and concomitant rights of the corporation are concerned, are as broad as or coextensive with those of the corporation itself.

[2] ID. — CONTRACTS — IMPLIED POWERS. — A corporation engaged in carrying on a business which it is authorized to do by its articles and the law under which it is organized has implied power to make all contracts which are essential to the successful prosecution of the business, or the making of which is an appropriate means by which it may be reasonably expected that the business in which the corporation is engaged will be advanced, or which are necessary and helpful to the conduct of its authorized business, or which tends directly to promote the business authorized by its articles and which it is doing.

[3] EASEMENTS — LICENSE TO USE IRRIGATION DITCH—EXPENDITURES OF MONEY IN RELIANCE UPON.—The secretary of the plaintiff corporation having possessed plenary power to make the agreement with defendants' predecessor whereby the latter was given the privilege of using the corporation's irrigation ditch for the purpose of conducting water to certain land, provided he would buy and cultivate the same, his entry into the use of said ditch was under a parol license from plaintiff, and upon the incurring by him of expenditures of money in buying the land and also for

Revocability of license to maintain a burden on land, after the licensee has incurred expense in reliance thereon, notes, 7 Ann. Cas. 706; 13 Ann. Cas. 843; Ann. Cas. 1913A, 74; 49 L. R. A. 497; 19 L. R. A. (N. S.) 700; 25 L. R. A. (N. S.) 727.

Acquisition of easement by prescription where original use was under license, notes, 13 Ann. Cas. 925; 44 L. R. A. (N. S.) 89.

the purpose of facilitating the use of the easement and in cultivating the land according to the suggestion of the said secretary of plaintiff, the license became irrevocable.

[4] ID.—IRREVOCABLE LICENSE — APPURTENANT EASEMENTS — RIGHTS OF SUCCESSORS IN INTEREST.—The license to use the ditch having become irrevocable, the right acquired thereby and thereunder by defendants' predecessor became appurtenant to the land of the latter and inured to the benefit of his successors in interest, notwithstanding the latter made no expenditures in improving the property upon the faith of plaintiff's representations.

[5] ESTOPPEL—RELIANCE UPON CONDUCT OF ANOTHER—BELIEF AS TO EXISTENCE OF FACTS.—If a person by his conduct induces another to believe in the existence of a particular state of facts, and the other acts thereon to his prejudice, the former is estopped, as against the latter, to deny that that state of facts does in truth exist.

[6] ID.—USE OF IRRIGATION DITCH—PROTEST TO TENANT—RIGHTS OF LANDLORD UNAFFECTED.—A protest, made by the owner of an irrigation ditch to the tenant or lessee of certain lands, against the use of said ditch in connection with the irrigation of said lands cannot break the operation of the estoppel against the owner of said ditch to deny the right of the owner of said lands to the use of such easement.

[7] EASEMENTS — CONTINUOUS USE.—Where one who claims an easement uses it as often as it may be necessary for him to do so, the use is generally held to be continuous, and this is particularly true with reference to easements connected with irrigation.

[8] ID.—ACTION TO ENJOIN USE OF DITCH — IRREVOCABLE LICENSE — ADVERSE USER — CONSISTENT DEFENSES. — In an action by the owner of an irrigation ditch to enjoin the use thereof by the defendants, defenses based upon irrevocable license and upon an easement by adverse user are not inconsistent.

APPEAL from a judgment of the Superior Court of Yolo County. W. A. Anderson, Judge. Affirmed.

The facts are stated in the opinion of the court.

Dudley D. Sales for Appellant.

A. C. Huston and Harry L. Huston for Respondents.

HART, J.—The plaintiff instituted this action for the purpose of securing a decree perpetually enjoining and restraining the defendants from using a certain ditch, known as the "Hungry Hollow Ditch" and the right of way over

which said ditch traverses and which is the property of the plaintiff. The alleged wrongful use of said ditch by the defendants consists of the "diversion of water from said ditch by and through an irrigating canal which connected with the same and extended to a certain piece of real property owned by defendant, Schaupp, and leased by the defendant, Altman." Said real property embraces 160 acres and, for the sake of convenience, will hereinafter be referred to as "the 160-acre tract."

The amended complaint sets out in detail the acts of the defendants constituting the alleged wrongful diversion of the water from said ditch. The answer to said complaint denies specifically the averments thereof and also sets up a number of special defenses which may be stated in substance as follows: 1. That plaintiff is estopped from denying that defendants have the right to the use of said ditch and right of way because of the representation by plaintiff to the predecessor in interest of defendants, one William Chaney, prior to the purchase of said tract by said Chaney, that the right to the use of said ditch and right of way would become, upon said purchase by said Chaney, appurtenant to said tract and that he could enjoy said use without cost; that said Chaney thereupon purchased the said 160-acre tract on the faith of said representations and expended money in constructing ditches and preparing said tract for cultivation; and in connection with this latter averment it is further alleged that the defendants and their predecessors in interest have used said ditch and right of way under a license and with the consent of plaintiff and "relying upon said license and consent have spent money in the construction of irrigating ditches and in preparing said land for cultivation"; 2. That the owners of said 160-acre tract were given the right to use said ditch and right of way for the purpose of obtaining water with which to irrigate said tract in an instrument whereby the right of way for said ditch was granted to the plaintiff company by the Bank of Woodland; that "at the time defendants' predecessor in interest purchased the 160-acre tract, plaintiff represented that said tract was contiguous to the said ditch and now the plaintiff is estopped to deny the truth of said statement." The right of the defendants to an easement in said ditch and right of way by prescription is also set up.

The cause was tried by the court sitting without a jury upon the amended complaint and the answer thereto and the court thereupon filed its findings of fact and conclusions of law, upholding the special defenses of the defendants and rendered and caused to be entered judgment accordingly. The appeal is by the plaintiff from said judgment under the alternative method.

The general contention of the appellant is that certain findings are not supported by the evidence and also that the conclusions of law are inconsistent with the findings of fact. As to the latter proposition, the contention is, in effect, that certain findings vital to the judgment, conceding that they are bottomed by sufficient evidentiary support, do not warrant the conclusions of law deduced therefrom by the court below. In other words, it is claimed that, admitting that the facts embraced within these findings are true, the trial court made an erroneous application of the law thereto.

The defendant, Schaupp, is the owner of the 160-acre tract and the defendant, Altman, the lessee thereof. The said 160-acre tract does not border upon the ditch, but adjoins on the west what is known as the "Foster land," which does abut upon the ditch.

The plaintiff was organized as a corporation in the month of October, 1909, from which time uninterruptedly down to the date of the trial one William Metzner was president thereof. Charles J. Cox, Junior, became the secretary of the corporation at or about the time of its organization and held and discharged the duties of that office down to and including the year 1912. In this connection it should be stated that there were two persons officially associated with the corporation by the name of Charles J. Cox, they being father and son. The former was a director of the plaintiff. It should further be stated that, during the time he was secretary of plaintiff, Charles J. Cox, Junior, was engaged in the general real estate business in the city of San Francisco under the name of Cox and Company. Upon its organization the plaintiff adopted by-laws for the government thereof and its business. Section 8 of article X of said by-laws provided: "It will be the duty of the Secretary to negotiate all contracts for the purchase of lands, water power and water rights; to supervise the de-

velopment and improvement of all lands belonging to the corporation, and to form and draw plans for the subdivision, general supervision and sale of lands, and to generally supervise the sale, purchase, development and marketing of the lands of the corporation.''

The plaintiff, in the year 1910, purchased from the Bank of Woodland a 3,000-acre tract of land, situated in Yolo County, having in view the subdividing of said tract into smaller farms and putting the same as so subdivided on the market for sale. In the month of September of said year 1910 (probably at the time that the tract referred to was acquired by the plaintiff), the said Bank of Woodland granted to plaintiff a right of way for a ditch, the purpose of the construction of which was to divert water from Cache Creek, in said county, to the tract of land mentioned, the right to the use of so much water as might be necessary for said purpose or as might be conveniently permitted to be used therefor having been granted to the plaintiff by the Yolo Water & Power Company. Among the covenants contained in the instrument granting said right of way to plaintiff was the following: ''It being further agreed and understood that the owners of land now contiguous to said right of way, and each of them, shall have the right to the use of said ditch for the purpose of conveying water therein for the irrigation of their land, such use to be free to them and to each of them.''

The plaintiff commenced the construction of a ditch over said right of way in the year 1910, shortly after the grant to it of said right by the Bank of Woodland. The said ditch taps Cache Creek at a point opposite the town of Capay, in Yolo County, and, having been completed, runs in a northeasterly direction for a distance of about six miles, where it reaches the tract of land already referred to as having been acquired by the plaintiff from the said Bank of Woodland. Said ditch is designated and known as the ''Hungry Hollow Ditch'' and is, in point of fact, a part of the irrigating system of the Yolo Water & Power Company.

On November 15, 1909, Charles J. Cox, Junior, secretary of the plaintiff, addressed a letter to one William Chaney, then residing in Hollister, California, proposing to secure for him the 160-acre tract in question. His letter reads:

"Dear Will: Enclosed you will find a small diagram of the land belonging to the Irrigated Valleys Land Company, showing the ditches in proximity to Cache Creek. The Company is building these ditches now, subdividing this big 3,000-acre tract into small farms and selling it for $125 per acre. The two pieces marked red on this map, consisting of 131 and 160 acres, respectively, adjoin our land and come under our ditch. I secured a contract on these two pieces Saturday, at $65 an acre, as the owner who is not a resident of this neighborhood does not know of the improvements going on there. It is fine rich soil and worth $150 an acre under ditch; anybody buying this now will get the benefit of the ditches for nothing. The Land Company have all they can handle and I would like to have some friend of mine buy this property. Would like to have you go up and see it this week, and hope to hear from you at your earliest convenience."

Chaney, testifying as a witness for the defendant, said that upon receiving the above letter, he wrote to Mr. Cox and asked him to give him further information with regard to the 160-acre tract; that Cox later visited him at his house and asked him to go with him (Cox) to see the land and the witness consented to and did do so. After inspecting the land, proceeded Chaney, "Cox told me if I bought it I could use the company's ditches, and that he wanted me to put out alfalfa, and he said it would be an advertisement for them and help sell their property." Cox further informed witness that he (Cox) was the secretary and manager of the plaintiff. Acting upon the statements and representations made by Cox, Chaney bought the property on the day that he had the conversation with the former. He testified that he would not have bought the property if he had known or thought that he could not have irrigated it. He further stated that he had often seen Cox in and about the property that he bought in the company of prospective purchasers of the subdivisions of the plaintiff's tract. The witness said that after he purchased the property he had a conversation with Cox about mapping the 160-acre tract as part of the lands of the Woodland tract and that Cox subsequently "showed me a map like this [a map being in the possession of the witness at the time he was testifying], and he said he had mapped that out and had marked it

'sold' in order to help the sales of the rest of the property.''
The witness testified that after purchasing and taking
possession of the land—in the fall of 1910—he proceeded
to prepare 40 acres of it for the raising of alfalfa and
that he seeded the land, built some laterals and used the
ditch in question for the purpose of irrigating the portion
of the land so utilized.   In the fall of 1911 he planted to
alfalfa an additional 30 acres and expended the sum of
$65.25 in putting a bulkhead into the main ditch and also
$50 to make a bulkhead in the lateral ditch which he dug
to carry the water from the main ditch to his tract.   Alto-
gether he expended approximately $200 in making prepara-
tion for the use of the water upon his land.   In addition to
this it cost him about $10 per acre to prepare the soil for
the growing of alfalfa and the seeding of the same.   He
testified that he commenced irrigating from the ditch in the
year 1911 and also used water from the ditch for the same
purpose in the year 1912, and that there was no objection
voiced against his use of the water from the ditch by any-
one connected with the plaintiff until the year 1912 when
he received a letter dated August 31st of that year from
plaintiff, in which it notified him that the company pro-
tested against his use of the water from the ditch of the
company, and informed him that ''the Irrigated Valleys
Land Company recognizes no right in you, or any right as
appurtenant to your land, to obtain water through the com-
pany's ditch, or any ditch which connects with said ditch.
There is not sufficient water to irrigate the lands adjoining
said ditch, without considering lands adjacent thereto.''
Upon receiving said letter, Chaney called on W. C. Wallace,
who had control for the company of the distribution of the
water flowing into and through the Hungry Hollow ditch,
and said to Mr. Wallace that he had received the letter
referred to and that that letter stated that there was not
sufficient water to accommodate the company's lands and
his land also, but that Wallace, nevertheless, turned the
water into the defendant's ditch.   The witness testified
that he had a conversation with C. J. Cox, Senior, and a
Mr. Wagner after he had purchased the land through the
former's son.   On that occasion Cox, Senior, who repre-
sented himself to Chaney as being a director of the plaintiff
and Mr. Wagner, while not directly telling him that he

could use the water, said to him that they were anxious that he should put his land in to alfalfa as soon as possible. From the general trend of the conversation with Cox, Senior, the witness understood that said Cox intended that he should use the water upon his land.

Chaney entered into an agreement for the sale of the land on the twenty-first day of November, 1912, to Frank Galentine. Galentine on the sixteenth day of August, 1913, assigned his contract with Chaney for the purchase of the land to W. E. Joerger. On the fourth day of December, 1917, Chaney and Joerger joined in a deed conveying the land to the defendant, Schaupp.

W. C. Wallace, heretofore mentioned as the man in charge of the distribution of the water of the Hungry Hollow ditch, testified that he distributed water to Chaney during the years 1911 and 1912 and to Joerger, while the latter was in possession of the land, during the years 1913, 1914, and 1915. He also furnished water to Galentine when he was in possession of the land. The defendant, D. J. Altman, testified that he bought property near the land in question in the year 1913 and was in a position at all times thereafter where he could observe operations on the 160-acre tract after it had been purchased from one Schultz by William Chaney. He stated that the land had been irrigated from the ditch during the years 1911 and 1912 and that in 1913 he took possession of the 160-acre tract under a lease; that he knew that the land had been irrigated from the water flowing through the Hungry Hollow ditch from the year 1911 to the year 1918, inclusive. He was particularly asked if the land was irrigated in the year 1916 and he replied that it was and that he saw the water on the land. He stated that a pumping plant was installed on the 160-acre tract but that enough water to irrigate the land could not be obtained from that source and that the land was always irrigated by water obtained from the Yolo Water & Power Company and flowing through the main ditch in question. The pumping plant was finally abandoned and the engine sold. During the time that he was in possession of the land he stated that no one interposed any objection to the use of the water from the ditch until just prior to the commencement of this action, when he received a letter from the company, protesting against further use of the

ditch by him.  He also specified the number of different
occasions in each year on which the portion of the 160-acre
tract which was under cultivation was irrigated from the
water of the ditch.

Metzner, president of the plaintiff, testified that the com-
pany never "entered into any agreement with the owner
or purported owner of this 160-acre tract in reference
to the use of water thereon taken from the Hungry Hollow
ditch." He stated that he had no knowledge of the di-
version of the water from the ditch to the 160-acre tract
until a short time prior to August 31, 1912, when the com-
pany addressed to Chaney the letter heretofore referred to,
declaring that the company recognized "no right in Chaney
or any right as appurtenant to his land," to obtain water
through the company's ditch or any ditch connected with
said ditch; that he had no knowledge thereafter of the use
of said water by Chaney or any of his successors in interest
until some time in 1918, when it was learned by the company
that the defendant, Altman, was diverting water to said
160-acre tract from the ditch and had diverted water from
the ditch to the said 160-acre tract in the year 1917; that,
upon learning this, the company addressed a letter to Alt-
man, protesting against the taking of any water from the
main canal of said company and diverting the same to the
160-acre tract in question and stating to him that unless
he ceased so taking and using said water legal steps would
be taken by the company to prevent him from further so
diverting and using the same.  Metzner testified that the
company received no written reply to the letter addressed
to Chaney, under date of August 31, 1912, but said that
about a week or ten days after sending said letter to
Chaney, he (Metzner) went to what is known as the Home
Ranch of the company's lands in Yolo County and that he
there met Chaney; that Chaney, addressing him, said: "I
got your letter, and I propose to use the water and you
can't stop me."  The witness said: "As far as I know,
Mr. Chaney never continued to make an attempt to use
it."  A letter written by G. D. Parish, a tenant in posses-
sion of the 160-acre tract, under date of May 20, 1916, was
received by the company and therein Parish asked the per-
mission of the company for the use of water to "wet a
piece of grain and alfalfa" on said land.  This letter was

introduced in evidence and Metzner said that, while no
written reply was made thereto, he later visited the prop-
erties of the company and there met Mr. Parish and said
to him that the company could not furnish him water at
that time. Metzner further testified that C. J. Cox, Junior,
under the firm name of Cox & Company was made the sell-
ing agent of the lands of the plaintiff. This agency existed
while said Cox was still secretary of the company.

G. D. Parish testified for the plaintiff in rebuttal that
he had the 160-acre tract leased during the years 1916 and
1917; that he did not use the water on the premises in
1916, but did irrigate from the ditch in the year 1917. He
stated that he did not have any alfalfa in 1916 because he
had no water.

It should also be stated that it was shown that the dis-
tribution of the water was controlled by an employee of
the plaintiff and that said employee generally used his own
judgment as to the turning in of the water upon the vari-
ous pieces of land which used the water from the Hungry
Hollow ditch.

The above statement represents substantially all the im-
portant testimony received at the trial.

The findings are not of specific facts but are general in
form, declaring that the allegations of the answer are true
and those of the complaint untrue. As we have seen, the
answer, besides specific denials, sets up the several different
and distinct special defenses above referred to, and sets
out with particularity the facts upon which each is founded.
It follows that all of the material facts so alleged, as well
as those facts which were brought out by the evidence in
support thereof, are comprehended within the findings or
were found to be true by the court, viz.: 1. That the grant
of the right of way for the ditch to the plaintiff by the
Bank of Woodland also specifically granted to the owner
of "land now *contiguous* to said right of way" the right
to the use of said ditch for the purpose of conveying water
therein for the irrigation of their lands, "such use to be free
to them and to each of them." 2. That Cox, Junior, was,
at the time of the purchase of the 160-acre tract by Chaney,
secretary of the plaintiff and its agent for the sale of the
lands embraced within the tract for the special irrigation of
which the right of way for a ditch was granted to it and the

main ditch was built; that Cox, Junior, as secretary of the plaintiff, was vested with full power to negotiate all contracts for the purchase of lands, water power, and water rights, and "to supervise the development of all lands belonging to the corporation"; that Cox, Junior, was also the selling agent of the plaintiff under the firm name of Cox & Company; that said Cox induced Chaney to purchase the 160-acre tract upon the representation and promise to the latter that if he (Chaney) would purchase said tract, he could have the use of the ditch for the purpose of conveying water to his land for irrigating the same; that said Cox further stated to Chaney, during the negotiations for the sale of the 160-acre tract to the latter, that it would be an advertisement and to the interest of the plaintiff's lands and thus facilitate the sale of the subdivisions thereof if he (Chaney) would purchase and sow the 160-acre tract to alfalfa and raise good crops thereon; that, solely upon the faith of the promise of Cox, Junior, that he could have the use of the said ditch, Chaney purchased the land; that Chaney would not have made said purchase but for said representation and promise; that Cox mapped the lands of the plaintiff and included therein as a part and parcel of the same the 160-acre tract, marking on said map the latter tract as having been sold. 3. That Chaney immediately entered into the possession of said 160-acre tract, expended large sums of money in preparing to convey the water from the main ditch to his land and in cultivating the said tract and in growing alfalfa and grain thereon; that he so used the main ditch in the years 1911 and 1912. 4. That in the month of August, 1912, the plaintiff demanded of Chaney in writing that he cease using the water of the ditch and, at the same time, likewise notified him that the company did not recognize in him any right to obtain water through its ditch or any ditch which connects with said ditch or that the right to use the ditch was appurtenant to the 160-acre tract; that within ten or twelve days after the receipt of the said written notice or demand to stop the further use of the ditch for the purpose of conveying water to his land, Chaney said to Metzner (president of plaintiff), referring to the plaintiff's protest against his further use of the ditch, "I propose to use the water and you can't stop me"; that from that time on down to the commence-

ment of this action on May 29, 1918, Chaney and his successors in interest, including the defendants, have continuously, uninterruptedly, notoriously, and under a claim of right used said ditch for conveying water for irrigating the 160-acre tract.

That the evidence, of which we have above presented an epitomized statement, is amply sufficient to support said findings is a proposition which it seems to us stands beyond the realms of doubt or disputation. The remaining question is, therefore, whether the court deduced from said findings the correct conclusions of law.

It is not necessary, nor is such the intention, to express a definite opinion upon the question whether the 160-acre tract is "contiguous" to the main ditch within the meaning and intent of the grant of the right of way for a ditch by the Bank of Woodland to the plaintiff. We may, however, venture these suggestions in connection with this proposition: That it is probable that the bank by the insertion of that covenant in the grant intended to confer upon all owners of land in the immediate community or neighborhood in which the tract of the plaintiff is situated the right to the use of the ditch for irrigating purposes; and the word "contiguous" would not be wholly inapt in the expression of such meaning and intent under the circumstances of this case. In Ann. Cas. 1918E, page 798, it is said that, while the primary meaning of the word "contiguous" is "in actual contact, touching, meeting or adjoining at the surface or border" (*Johnston* v. *Davenport Brick etc. Co.*, 237 Fed. 668), and that it must, therefore, always be so understood, unless the context shows it was otherwise intended (*Holston Salt etc. Co.* v. *Campbell*, 89 Va. 396 [16 S. E. 274]), still the meaning of the word depends largely on the subject matter to which it is applied. (*Griffin* v. *Denison Land Co.*, 18 N. D. 246 [119 N. W. 1041].) It is reasonable to suppose that if the right-of-way was granted by the bank for the exclusive use and benefit of the lands embraced within the plaintiff's 3000-acre tract, the instrument granting the easement would probably have expressly so provided, or, in other words, restricted the employment of the ditch to such use, and, therefore, the fact of the omission from the grant of such a provision affords some support to the suggestion that the word "contiguous" was used in the grant as in-

dicating an intention in the grantor to give to owners of land in the immediate vicinity of plaintiff's tract, and not included within the latter, the right to use the ditch for the irrigation of their lands. But, whatever may be the correct interpretation of the grant in that respect, it is clear that the judgment may and should be sustained upon other considerations.

[1] As secretary of the plaintiff, Cox, Junior, it will be observed, was vested with full power not only to sell the lands and water rights of the plaintiff, but was also given general power to develop the said lands for marketing purposes. He was also, moreover, by special action of the board of directors of the plaintiff, given authority to act as its sales agent and manager, with power to sell its lands. As secretary, in so far as the authority to dispose of the lands and concomitant rights of plaintiff was concerned, his powers were as broad as or coextensive with those of the corporation itself. And, as is said by Chief Justice Shaw in the very recent case of *Woods Lumber Co.* v. *Moore,* 183 Cal. 497, 501 [11 A. L. R. 549, 191 Pac. 905] :

[2] "A corporation engaged in carrying on a business which it is authorized to do by its articles and the law under which it is organized has implied power to make all contracts which are 'essential to the successful prosecution of the business' (Civ. Code, sec. 354, subd. 8; *Bates* v. *Coronado B. Co.,* 109 Cal. 163 [41 Pac. 855] ; *Mercantile Trust Co.* v. *Kiser,* 91 Ga. 636 [18 S. E. 358]), or the making of which is an appropriate means by which it may be 'reasonably expected that the business in which the corporation is engaged will be advanced' (*Depot R. Syndicate* v. *Enterprise Brewing Co.,* 87 Or. 560 [L. R. A. 1918C, 1001, 170 Pac. 294, 171 Pac. 223]), or which are 'necessary and helpful to the conduct of its authorized business' (*Timm* v. *Grand Rapids Br. Co.,* 160 Mich. 371 [27 L. R. A. (N. S.) 186, 125 N. W. 357]), or which tends directly to promote the business authorized by its articles and which it is doing. (*Kraft* v. *West Side Brewery Co.,* 219 Ill. 205 [66 N. E. 372] ; *Central L. Co.* v. *Kelter,* 201 Ill. 503 [66 N. E. 543] ; *Blue Island Br. Co.* v. *Fraatz,* 123 Ill. App. 26; *Horst* v. *Lewis,* 71 Neb. 365 [98 N. W. 1046, 103 N. W. 460].) "

That the plaintiff is authorized, either expressly or impliedly, to do all of these things for the successful prosecution of the business for the carrying on of which it was or-

ganized, there can be no manner of doubt; and, as above suggested, it is equally clear from the evidence that Cox, Junior, as secretary and sales agent of the plaintiff, was clothed with like authority. And, obviously, if the agreement that said Cox made with Chaney would, as Cox so conceived, and as we may assume from the evidence that it did, directly tend to promote the authorized business of the plaintiff, or be ''an appropriate means'' whereby it might reasonably be expected that the business of plaintiff would be advanced, then the act of making the agreement was within the scope of his authority as the agent of the plaintiff and the latter is, consequently, bound thereby.

[3] It being true, then, that Cox possessed plenary power, as secretary and sales-manager of the corporation, to make for and in behalf of the corporation the said agreement with Chaney, it follows that Chaney entered into the use of the ditch under a parol license from the plaintiff and that, upon the incurring by him of expenditures of money in buying the land and also for the purpose of facilitating the use of the easement and in cultivating the tract according to the suggestion of Cox, Junior, the license became irrevocable. (*Churchill* v. *Russell*, 148 Cal. 1 [82 Pac. 440]; *Stoner* v. *Zucker*, 148 Cal. 516 [113 Am. St. Rep. 301, 7 Ann. Cas. 704, 83 Pac. 808]; *Roseberry* v. *Clark*, 23 Cal. App. 549 [138 Pac. 923]; *Smith* v. *Green*, 109 Cal. 228, 234 [41 Pac. 1022]; *Blankenship* v. *Whaley*, 124 Cal. 300, 304 [57 Pac. 79]; *Flickinger* v. *Shaw*, 87 Cal. 126, 131 [22 Am. St. Rep. 234, 11 L. R. A. 132, 25 Pac. 268]; *Rerick* v. *Kern*, 14 Serg. & R. (Pa.) 271 [16 Am. Dec. 497]; *Stepp* v. *Williams*, 52 Cal. App. 237 [198 Pac. 661, 668, 669]; *Raritan Waterpower Co.* v. *Veghte*, 21 N. J. Eq. 475. See, also, comment of Professor Freeman on the last-named case in 16 Am. Dec. 501 et seq.)

In *Stoner* v. *Zucker, supra*, at page 520, the doctrine is thus explained:

''The recognized principle, therefore, is that where a licensee has entered [upon the premises of another] under a parol license and has expended money, or its equivalent in labor, in the execution of the license, the license becomes irrevocable, the licensee will have a right of entry upon the lands of the licensor for the purpose of maintaining his structures, or, in general, his rights under his license, and

the license will continue for so long a time as the nature of it calls for.''

In *Raritan Waterpower Co.* v. *Veghte, supra,* the rule is stated as follows:

''To the extent that the license is executed, equity will not disturb it or permit its revocation. Where improvements of a permanent nature have been made by a person on his own land, the enjoyment of which depends upon a right recognizable by the law, affecting the land of another, and to which his consent is necessary, and where such consent is expressly proved, or necessarily implied from the circumstances, and the improvements have been made in good faith upon it, equity will not permit advantage to be taken of the form of consent, although not according to the strict mode of the common law, or within the statute of frauds; and to defeat such a purpose will, upon a proper bill filed, enjoin the licensor from accomplishing his fraud, or when he asks relief it will be refused, or if granted, will be allowed merely in the shape of compensation, but protecting the right of the licensee.''

[4] Appellant, however, takes the position that the license whereby Chaney acquired the right to the easement cannot inure to the benefit of his successors in interest, inasmuch as the latter themselves made no expenditures in improving the property upon the faith of any representations made by Cox to Chaney and that no representations were made to them. In other words, the contention is that an estoppel cannot be set up here for the reason that there were no representations or promises made by Cox, Junior, to any of the successors in interest of Chaney. The reply to this proposition is, though, that the license under which Chaney entered into the use of the ditch having become irrevocable, the right acquired thereby and thereunder became appurtenant to the 160-acre tract. Furthermore, the successors in interest of Chaney took the land with the ditch as constructed by the latter and which connected with the main ditch and the said ditch remained in the same condition from the time of its construction down to the date of the institution of this action, during which period of time the appellant made no attempt to interrupt the use of the ditch in any manner until August 31, 1912, and, later, April 30, 1918 (approximately a month prior to the commencement of this action),

on which former date the letter heretofore referred to was addressed to Chaney and on which latter date it addressed a letter to the defendant, Altman, a tenant and not the owner of the 160-acre tract, objecting to the further use of the ditch for the purpose of irrigating said tract. It is not necessary to the working of an estoppel that in such a situation there should be direct or affirmative verbal representations. Such representations may arise by implication. In this case, the plaintiff, although, as we will later show in considering another branch of the case, having knowledge that the successors in interest of Chaney had used and were using the ditch, remained silent, addressing no protest against such use to the successors of Chaney and thus by conduct recognized the validity of the license by which Chaney acquired the right to the easement and so acquiesced therein. As the law-writers say, "quiescence is tantamount to acquiescence." [5] In other words, "if a person by his conduct induces another to believe in the existence of a particular state of facts, and the other acts thereon to his prejudice, the former is estopped, as against the latter, to deny that that state of facts does in truth exist." (21 C. J., p. 1060.) The ground upon which the estoppel rests is that the conduct constitutes an *implied representation* of the truth of the state of facts in question. (Bigelow on Estoppel, 5th ed., p. 570.) There can be no doubt—indeed, it must be assumed from the fact that the irrigation of the land was necessary to the successful growing of alfalfa and other grain—that the successors in interest of Chaney would not have bought the same but for their knowledge of the fact that said easement was appurtenant to said tract.

Counsel for the appellant, however, declares that the letters from the plaintiff to Chaney and Altman, protesting against their use of the ditch, constitute convincing, if not conclusive, evidence that the respondents were not given the license pleaded in the answer. But the answer to this is that permission had been granted to Chaney to use the ditch and the same had developed into an irrevocable license before said letters were received by either of the parties named. [6] Moreover, Altman, as we have seen, was only a tenant or lessee of the 160-acre tract and in such case such a protest addressed to a mere tenant of the property against the

use of the easement cannot break the operation of the estoppel.

But the judgment may securely rest upon the finding that the defendant, Schaupp, acquired title to the easement or the right to the use of the ditch by prescription. As seen, the plaintiff, in a letter to Chaney, under date of August 31, 1912, notified him to cease using the ditch, but a few days thereafter, Metzner, president of the plaintiff, according to his own testimony, met Chaney and they discussed the matter of the receipt of said letter and Chaney then declared to Metzner that he proposed to use the ditch or the water, "and you can't stop me." The evidence clearly shows that from that time until and immediately preceding the date of the commencement of the present action Chaney and his successors in interest continuously used the ditch under a claim of right, or, in other words, for a period of more than five years from the date of said conversation between Metzner and Chaney. It is true that one witness testified that in the year 1916 no water from the ditch was used on the land, the explanation being that the spring of 1916 was a late, wet season and that there was really no necessity for using the ditch. This testimony came from the 1916 lessee of the 160-acre tract. This, though, if true, would not be such an omission in the use of the ditch as to have the effect of breaking the continuity of the user. The failure, if any, to use the ditch in the year 1916 was not due to any act of the owner but to the fact only that the circumstances were such that water from the ditch was not needed. The omission amounted neither to a nonuser nor evidence of an intention to abandon the easement. In other words, as counsel for the defendants well say, "continuous use" does not necessarily mean "constant use." **[7]** Where one who claims an easement uses it as often as it may be necessary for him to do so, the use is generally held to be continuous and this is particularly true with reference to easements connected with irrigation. (*Hesperia Land & Water Co.* v. *Rogers,* 83 Cal. 10 [17 Am. St. Rep. 209, 23 Pac. 196]; *Bodfish* v. *Bodfish,* 105 Mass. 619.) There was, however, other testimony to the effect that water was conveyed to the 160-acre tract from the ditch in the year 1916. And from the entire evidence the court remained well within its discretion in finding that the defendants claimed and exercised the right to use the

ditch openly and continuously and uninterruptedly and in hostility to the claim of the plaintiff for a period of over five years immediately preceding the date of the commencement of this action. Metzner, it is true, testified that he had no knowledge of the use of the ditch by Chaney and his successors in interest and had no means of ascertaining whether the ditch was being so used; but he also testified that he had instructed the foremen of the plaintiff having charge of the distribution of the water flowing in the ditch to watch and report if any attempt was made to irrigate the 160-acre tract from the company's ditches. But, notwithstanding this instruction, as the evidence shows, the employees of the appellant who had charge of the ditches and the distribution of the water thereof continued, during the prescriptive period, to supply water for the 160-acre tract through the ditch in question. Furthermore, it was shown that Cox, Senior, who was a director of the company at the time, had a conversation with Chaney after the latter had purchased the 160-acre tract and that said Cox stated to Chaney that the company was anxious that he should put the land into alfalfa as soon as possible. It was also shown, as we have seen, that Cox, Junior, was often near the 160-acre tract after the sale thereof to Chaney, accompanied generally by persons to whom he desired to sell subdivisions of the plaintiff's tract. From all this and the fact that water was actually supplied to the 160-acre tract by means of the main ditch during every year from 1912 to 1918, inclusive, the court could well have concluded that if it was true that the appellant had no knowledge of the use of the easement by Chaney and his successors in interest, it certainly had ready means for ascertaining the fact. But, under all the circumstances of the case as they were developed at the trial, it is hardly reasonable to believe that the appellant did not know at all times that its ditches were being used by the several owners of the 160-acre tract. Indeed, the knowledge of Cox, Junior, the secretary, and also that of its several foremen, whose special business or duty it was to distribute the water flowing through the main ditch to those entitled thereto, that the ditch was being used by Chaney and his successors, was the knowledge of that fact of the appellant itself, since not only said Cox as secretary, but also said foremen were the agents of appellant with full

power to act for it in all the matters committed to them by the plaintiff.

But it is further argued that, from the fact that the owner in the year 1915 installed a pumping plant on the 160-acre tract, capable, as is the claim, of irrigating the entire acreage, and from the further fact that a tenant in 1916 asked permission of the company to irrigate the tract from its ditches, the irresistible conclusion is, and the court should have so found, that the appellant could not have known, nor did it have any reason to believe, that the 160-acre tract was being supplied with water conveyed through the company's ditches. But there is no showing here that the appellant had any knowledge of the existence or the establishment of the pumping plant; and the fact that a tenant of the owner of the land in 1916 asked permission of the company to irrigate said land from its ditches would not necessarily show that said ditches had not been used or were not being used for the purpose of conveying water to the lands of the defendants, or that the appellant did not know that they were being so used. At any rate, the trial court, it seems, did not attach any significance to the circumstances here referred to, concluding, as we may presume, and as it had a right to do, that the other facts and circumstances in the case, tending to show the continuous and uninterrupted use of the easement, were sufficient to overcome the probative effect of any facts or circumstances leading to an opposite conclusion upon the question of adverse user.

[8] Lastly, we may briefly consider the point, made at the threshold of appellant's argument, that the defense based on the license and that of title to the easement by adverse user are inconsistent, in that possession by license is not adverse and cannot ripen into a title. If the license were revocable there would no doubt be force in that contention; but, as we have shown, the license became irrevocable, and it was within the right of defendants to set up either or both of the said defenses as the basis of their title to the easement. The situation is no different from a case where a party, suing to quiet title to land, would set up and prove a conventional title thereto and at the same time title by adverse possession. (*Porters Bar Dredging Co.* v. *Beaudry,* 15 Cal. App. 751, 763 [115 Pac. 951].) It follows, also,

that there is no inconsistency between the findings and the conclusions of law for the reason suggested.

We have discovered no substantial reason for disturbing the judgment herein, and it is, accordingly, affirmed.

Burnett, J., and Finch, P. J., concurred.